# EXHIBIT I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GERALD LEE and STEVE TAYLOR, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

No. 3:07-CV-044956-SI

CONAM INSPECTION AND ENGINEERING SERVICES, INC.,

Defendant.

ORIGINAL

---

DEPOSITION OF GERALD LEE

Los Angeles, California

Thursday, June 12, 2008

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 89462B

A I started there as an assistant, NDE assistant.
Q What's NDE?
A NDE stands for nondestructive examination. And I didn't have any certs at the time, so I was assisting the technicians.
Q And nondestructive examination means that you inspect a refinery or refinery equipment without taking it apart, essentially?
A Without damaging it.
Q Is that accomplished through using things like x-rays and ultrasounds and that sort of thing?
A Uh-huh.
Q Did you at some --
MR. TINDALL: You need to say yes.
THE WITNESS: Yes.
BY MR. TORRANO:
Q Did you at some point graduate from being an assistant to being a technician?
A Yes.
Q When did that happen?
A In '92.
Q What kind of technician did you become?
A Ultrasound, magnetic particle and penetrate testing technician.
Q What was the last one?

A Penetrate testing.
Q What is that?
A It's red dye that you spray on the part, you let it sit for about 10 minutes, then you wipe it off, and you spray a white substance and any discontinuities come up, will show up through the white -- I mean the white contrast, powder.
Q I see.
A And you have to evaluate it from there.
Q Were you required to get some kind of certification in these various kinds of --
A Yes.
Q -- technologies?
Is that a state agency that does that or is that a trade organization that does that?
A Trade organization.
Q After you got these certifications you became a technician for, is it MMP?
A Yes.
Q All right. Was that a promotion?
A Yes.
Q When you went to work for MMP, at what location did you primarily work?
A I would say this refinery, it was called UltraMar at the time, now it's -- the name of it is Valero.

Q Where is that located?
A It's in Wilmington.
Q How many other MMP employees were working at that location when you started there, to the best of your recollection?
A Maybe 25 to 30.
Q All right. Did you at some point change locations from the UltraMar location?
A Well, that's mainly where I worked, but I jumped around quite often.
Q When you say you jumped around, in what context would you jump around?
A If work got slow, I was on callout, and they would send me to different refineries. I worked at ARCO, now it's BP, but it wasn't -- I was only there maybe a couple of days a week, and I worked at Texaco, and sometimes they sent me out of town.
Q Do you recall when MMP was purchased by CONAM?
A In '96.
Q Were you still a technician at that point?
A No.
Q Okay. After you became a technician in 1992 what happened after that in terms of your job?
A I got more certification as a visual inspector.
Q When was that?

A In '96.
Q What does a visual inspector do?
A They oversee welding jobs, they assist the refinery inspector with corrosion monitoring and they kind of oversee the NDE technicians as well.
Q I see. Was your title still technically technician or had it changed?
A No. I was a CWI inspector.
Q What does CWI stand for?
A Certified welding inspector.
Q So your job changed --
A Uh-huh. Yes.
Q -- in 1996?
A Yes.
Q Did you get the CWI position while you were still working for MMP or was that after CONAM took over?
A It was after CONAM took over.
Q After that did your job change?
A I just acquired more certs, and, yes, it did change a little.
Q When did it next change and how?
A I got two more certs.
Q Which ones?
A It's the 510, API 510, that deals with pressure vessels, and the API 570, and that's dealing with piping.

Q So that gave you technical ability to deal with pressure vessels whereas you had not before and also to deal with piping whereas you had not before?
A Yes.
Q How did that change your duties at CONAM then?
A Well, a position became open at BP as a mechanical inspector overseeing capital projects.
Q And a capital project would be a new installation of something?
A Yes.
Q When did that become open?
A That became open in, for me, in 2003.
Q So until 2003 your primary location was UltraMar, but you might go out on other jobs to other locations, and then in 2003, you took a job at CONAM, the BP location?
MR. TINDALL: Objection; compound.
You can answer.
THE WITNESS: Okay. No. From -- from 1997 I was at BP as a CWI for two years, that project ended, and then I was traveling again, and between '99 to 2003, in 2003 I acquired that other position.
BY MR. TORRANO:
Q Let me make sure I understand what you were doing between 1999 and 2003, or during that period. Where was your primary location for that period of time, if there

was one?
A Well, I was at Exxon/Mobil.
Q Where's that located?
A In Torrance.
Q That was your primary location; is that right?
A Uh-huh. Yes.
Q And then during that period your primary location was Exxon/Mobil, but you'd get sent out to other jobs to other places sometimes?
A Yes.
Q Is that being -- is that called being called out or --
A No. Exxon/Mobil, I did on one year on one project, and then it got slow, and maybe about two months later I was sent back for another year.
Q To Exxon/Mobil again?
A Uh-huh. Yes.
Q See, it's harder than you thought.
MR. TINDALL: You're doing fine.
BY MR. TORRANO:
Q So when you started as an NDE assistant way back when, in 1991, you were at the UltraMar facility, which is now known as Valero?
A Yes.
Q Then you got additional certifications and got

some promotions and continued on in terms of the kinds of duties you were doing, in 1996 CONAM purchased MMP, at that stage, as I understand it, you were still primarily at the Valero location, in 1997 you got a 2-year position, essentially, at BP Carson; is that right?
A Yes.
Q Okay. After that 2 years was up, between 1999 and 2003 you were primarily stationed at Exxon/Mobil in Torrance, but, again, periodically you'd get sent to other facilities depending on need; is that right?
A Need and -- yeah, basically need.
Q Okay. To the extent they needed you somewhere else, they'd call you up to do something else; is that right?
A Yes.
Q Then in 2003 you got the capital project inspector position at BP Carson?
A Yes.
Q And you were -- well, strike that.
What happened after that? Did you stay at BP Carson until you left the company?
A Yes.
Q In the same position?
A Yes.
Q All right. So just to give the end, the recap,

you took the capital project inspector job in 2003, which was at BP Carson, and you kept that until you went to BP as an employee in 2007?
A Yes.
Q All right. Does that summarize your work trajectory as basically as we can at this point?
A Yes.
Q Other than the locations you've told me about, can you think of other locations at MMP or CONAM at which you worked during the time you were employed there?
A For -- I mean, I did day jobs. I can't -- I can't remember where I went.
Q Okay. So you did day jobs, you went on other projects. Have you told me the locations where you primarily worked, that is, the primary locations where you worked?
A Right.
Q Is that right?
A Yes.
Q Okay.
I'd like to mark, as Exhibit 1 -- off the record for a second.
(Discussion off the record.)
MR. TORRANO: Let's mark, as Exhibit 4, a document entitled "Acknowledgement" Bates-stamped

working a 5-8?
A Correct.
Q What location was that?
A Valero.
Q At some point did you start working a 4-10?
A Only when I worked at BP.
Q BP Carson?
A Yeah.
Q So everywhere else when you worked when it was either MMP Quality or CONAM you worked an 8-5, but when you were at Carson BP you worked a 4-10?
A No. At Exxon/Mobil I worked 9-80s.
Q You said that was Wilmington, again?
A That was in Torrance.
Q Sorry. So that was for the period between 1999 and 2003?
A Yes.
Q Your best recollection is that when you started at MMP Quality you were working 8-5s, that in 1995 MMP went to a 4-10, to the best of your knowledge at BP Carson, but you were still working at Valero and you stayed on your 8-5 --
A Yes.
Q -- is that right?
And then when you went to Exxon/Mobil in 1999 you

were working a 9-80 --
A Yes.
Q -- is that right? Okay.
And then when you went to Carson BP in 2003 what schedule did you work then?
A 4-10s.
Q 4-10s. So then you worked 4-10s from 2003 at BP Carson till the time that you left and went to BP?
A No. I also worked 4-10s between '97 and '99.
Q When you worked at BP Carson?
A Yes.
Q Gotcha. Okay. So to summarize, one more time, so we can get it straight, '91 to '97, you were working a 5-8?
A '91 to '97.
Q Because in '97 you went to BP Carson --
A Yes.
Q -- is that right?
A But in this -- in our industry, we would work, like a shutdown period where they'd work 7-12s, but I was still billed on a 5-8 schedule, but we worked 7 days a week, 12 hours a day.
Q Periodically when you did shutdowns or -- is that what they're called, shutdowns?
A Yes.

Q I take it that's when they shut the machinery down that you're working on because in order to do maintenance they can't keep it running?
A Yes.
Q Okay. So there's urgency to get it back up and running, so they work longer hours?
A Yes.
Q Do you recall the first time you did a shutdown?
A '91.
Q Do you recall what location that was at?
A It was at BP.
Q BP Carson?
A It was ARCO at the time.
Q Right.
A But I was only there for two weeks.
Q What was your schedule for that two weeks, if you remember?
A It was 6:00 to 6:30. I was there a short time.
Q And when you worked on a turnaround, how was overtime paid to you?
MR. TINDALL: Objection; vague as to time.
BY MR. TORRANO:
Q I'm talking about that particular instance. Do you recall?
A Oh, I know.

Q How did it work?
A 8 hours were straight, 4 hours was time and a half --
Q Gotcha.
A -- Monday through Friday, Saturday it was paid 8 hours -- no, Saturday was time and a half all day, Sunday all day was double time.
Q Gotcha. Is that the pay practice, to the best of your recollection, that you had each time you worked one of those turnaround situations?
MR. TINDALL: Objection; vague as to time.
BY MR. TORRANO:
Q Throughout --
MR. TINDALL: The whole time?
BY MR. TORRANO:
Q -- the whole time.
A No. It was different.
Q That was just that time. All right.
Stepping back to your regular schedule, leaving the turnaround situations aside, I do want to try to get a firm understanding of how you were scheduled in the normal course.
So, as I understand it, from '91 -- strike that.
As I understand it, in '91 you went to work at what was then UltraMar and you were working 5-80 at that

point; is that right?
A Yeah, 5-40s.
Q 5-40, yeah, 5 days a week, 8 hours a day; is that right?
A Yes.
Q As I understand it, in 1997 you went to work at BP Carson?
A Yes.
Q At which point you started working a 4-10?
A Yes.
Q All right. Next, as I understand it, in 1999, you went to Exxon/Mobil in Torrance and worked there from '99 to 2003, and during that period you were working a 9-80 --
A Yes.
Q -- is that right?
Okay. In 2003 you then took the capital project inspector job at BP Carson, at which point you started working a 4-10 again?
A Yes.
Q And that continued until you left the company in April of 2007?
A Yes.
Q Okay.
MR. TINDALL: Again, you're talking about his

usual schedule --
MR. TORRANO: Yes.
MR. TINDALL: -- not taking into account turnarounds.
BY MR. TORRANO:
Q Now, you testified about how you were compensated during the first turnaround you did in 1991. I asked whether that was the way you were compensated for turnaround work in subsequent years, and you said no, it varied.
Can you recall the next time you did a turnaround job for the company where you were working, you know, 7 days a week?
A The very next one?
Q Yeah.
A It was the same thing.
Q Same thing. Do you remember the first time you weren't compensated that way?
A It changed when we were doing shutdowns at BP.
Q BP Carson, okay. So when you worked a shutdown at BP Carson, how did the overtime work there?
A Monday through Thursdays, that's 10 hours straight with 2 hours over was time and a half; Friday, the first 8 hours is time and a half, the next 4 is double time; Saturday and Sunday, the same way as Friday.

Q Okay. Are those the two different ways you were compensated for overtime during shutdown/turnaround situations?
A Yes.
Q Can you think of any others?
A No.
Q When you worked at UltraMar, which then became Valero, do you recall how many employees were employed there? I think you said 25 to 30?
A Yes.
Q Did that remain constant during the time you were there, that is, from '91 to '97?
A Yes.
Q When you worked at BP Carson from '97 to 1999, can you remember how many employees were employed there during that period?
A Maybe say about 100.
Q That's 100 CONAM employees or 100 BP employees?
A CONAM. I'd say about between 75 and 100. I can't be exact.
Q Okay. Then in 1999, you went to the Exxon/Mobil facility in Torrance. From '99 to '03 how many CONAM employees would you say were employed there during that period?
A Three.

Q Three, okay. I want to make sure I'm clear on something. When you say 75 to 100, you mean at any given time; is that right? That's what I'm asking. I don't mean total, you know, people coming and going and all the people if you add them up. I mean at any given time in that period 1997 time frame how many were on-site?
A About that.
Q Okay. When you went back as a capital project inspector to BP Carson in 2003, about how many CONAM employees were there then?
A I'd say about the same.
Q 75 to 100.
And after that time, from 2003 to April 2007 when you left, and I know you only went to another company, but when you stopped working for CONAM, about how many employees would you say there were when you left in 2007?
A About the same.
Q About the same.
Was there ever a dramatic variation in that number of employees while you were there?
A No.
Q Did you ever participate anywhere at CONAM at any time in an alternative workweek election?
A No.
Q Had you ever heard the term "alternative workweek

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

schedule" before this lawsuit was filed?
A No.
Q Did anyone ever tell you at CONAM orally that you were all working an alternative workweek schedule?
A Repeat that.
Q While you worked at CONAM did anybody in management or any supervisor ever tell you, as an employee, that you were working an alternative workweek schedule?
A No.
Q Did you ever complain about the schedule that you worked at CONAM, particularly at BP Carson?
A No.
Q Did you ever hear anyone else complain about it?
A No.
Q Did you like the schedule, did you like a 4-10 schedule?
A Yes.
Q Was it your impression that most of the CONAM employees liked the 4-10 schedule?
MR. TINDALL: Objection; lack of personal knowledge, calls for speculation.
BY MR. TORRANO:
Q You can go ahead.
A I believe so.

Q Yeah. Do you know what the schedules were for CONAM locations outside Southern California while you worked at CONAM?
A No.
Q Did you ever work at CONAM facilities -- strike that.
Did you ever work for CONAM at refinery facilities or other facilities outside Southern California?
A Yes.
Q When was that?
A That was in between '99 and 2001.
Q What did you do?
A I was called out to do some heater tube work at Pittsburgh, at a boiler plant in Pittsburgh, California.
Q Do you remember the name of the plant?
A I can't remember. I was only there for about two weeks.
Q All right. So sometime in the time frame 1999 to 2001 you were called out up to Pittsburgh for about two weeks to work on a boiler plant; is that right?
A Yes.
Q Is that the only time you worked outside the Southern California area on behalf of CONAM?
A Yes.

Q Do you recall how you were compensated during that two-week period that you worked up in Pittsburgh?
A Yes.
Q How so?
A 5-8s.
Q When you did callouts, were you typically compensated 5-8s?
MR. TINDALL: Objection; vague and ambiguous.
THE WITNESS: Yes.
BY MR. TORRANO:
Q I'm sorry?
A Yes.
Q With what -- let's just take the last year you were employed at CONAM as an example, just so I can get an idea, with what frequency would you be sent off on a callout in any particular year, let's say, for instance, the last three months -- or the first three months of 2007?
A I wasn't.
Q Wasn't at all.
How about in 2006, were you doing any callouts in 2006?
A No.
Q Okay. Maybe I could just ask you to explain, during what period of your employment were callouts

something that you were doing versus not?
A From 2003 to 2007 I was stationed at BP, I didn't go anywhere else.
Q No callouts. Prior to that time --
A The only time I was called out is when I was in between projects or in between jobs.
Q What was the name of the friend you spoke with about --
A The roommate?
Q -- the potential claims?
Yeah.
A Russel Dell.
Q Russel Dell?
A Yeah.
Q And he was your roommate at the time.
Where do you currently live?
A In Long Beach.
Q In an apartment or a house?
A House.
Q Do you own it or rent it?
A Own it.
Q How long have you lived in Long Beach in the house?
A Since 2005.
Q Where did you live before then?

Q Do you know from firsthand knowledge whether others who worked for CONAM took a second meal break to the extent they were working between 12 -- strike that, 10 and 12 hours?
A No.
MR. TINDALL: I'm sorry, no, you don't know or no, they didn't take it?
THE WITNESS: No, I didn't know.
BY MR. TORRANO:
Q Okay. When you were working -- strike that.
Do you have any knowledge of how many employees CONAM employed at the Shell facility in Benecia at any point?
A No, I don't know how many.
Q Do you know anything about the pay practices of CONAM -- strike that.
During the time that you worked for CONAM did you have any knowledge of the pay practices of CONAM with regard to its employees that worked at the Shell facility in Benecia?
A No.
Q Have you ever reviewed payroll records for any of CONAM's employees?
A No.
Q Have you ever reviewed your own payroll records?

Page 49

A No.
Q To the extent employees were working on a callout basis at CONAM during the entire time you were working there do you know one way or the other whether they were compensated for overtime in excess of 8 hours in a day?
MR. TINDALL: Objection; lack of personal knowledge.
THE WITNESS: For callout?
BY MR. TORRANO:
Q Correct.
A Yes.
Q What do you know?
A They were paid time and a half after 8.
Q Okay. If they were on a callout?
A Correct.
Q Do you have any direct knowledge of CONAM's pay practices with regard to any employee other than yourself?
A No.
MR. TINDALL: Objection; vague and ambiguous.
BY MR. TORRANO:
Q I'm going to show you a list of employees that are contained in your interrogatory responses in this case.
Off the record.
(Discussion off the record.)

Page 50

BY MR. TORRANO:
Q We asked a series of interrogatory questions to you, you responded through your lawyers, and one of the questions was, with regard to the particular claims you've made about overtime, second meal breaks, wage statements, those sorts of things -- that would be a great thing, Steven -- we asked a series of interrogatories that were identical which was, can you identify the people that you're referring to that were agrieved by this situation, and then on a number of occasions this list of employees was set forth, and it's the same list in every category.
My question's pretty simple: Do you know how that list of names was compiled?
A No, I don't.
Q I take it that you did not compile that list?
A No, I did not.
Q Do you know one way or another from personal knowledge whether any of the individuals listed on that list were agrieved or treated improperly by CONAM in regard to pay practices, meal periods and that sort of thing?
MR. TINDALL: Objection; vague and ambiguous, calls for a legal conclusion.
You can take a look at the list.
THE WITNESS: Yes.

Page 51

BY MR. TORRANO:
Q What do you know?
A A lot of -- a few people, these names on here, they worked at BP.
Q So when you say they worked at BP, your testimony is that you know that they -- or at least you believe they worked a 4-10; is that right?
A Yes.
Q Other than that, do you know from firsthand knowledge anything about the names on the list?
MR. TINDALL: Objection; vague and ambiguous.
THE WITNESS: What was your question again?
BY MR. TORRANO:
Q Other than what you just testified to do you know anything about whether or not the people who are listed on your interrogatory response were agrieved by any of CONAM's pay practices or meal period practices?
MR. TINDALL: Objection; vague and ambiguous, calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. TORRANO:
Q What else do you know?
A No. I mean no. Sorry.
Q Okay. So other than what you testified to you don't have any firsthand knowledge regarding these

Page 52

individuals; is that right?
A Yes.
Q Okay.
MR. TINDALL: Just for the record, he knows some things about these individuals; some of the people he knows.
MR. TORRANO: Yeah. Okay. I understand.
MR. TINDALL: Okay.
MR. TORRANO: Well, we just took a break just a couple of minutes ago. I am at near a stopping point, so I just do want to take 2 more minutes -- probably be about 5 minutes -- and look through all of my notes to make sure I'm not missing anything, then I'll be back, and we should be able to get you out of here.
THE WITNESS: All right. Thank you.
MR. TINDALL: Okay.
(Recess.)
MR. TORRANO: Back on the record.
Q With regard to the employees for CONAM who worked at the BP Carson facility do you have any sense, other than for yourself, of the frequency with which those employees would work more than 10 hours in a day?
A The frequency?
Q Yeah. How often would that happen?
A How often? You need a count, a number count?



Q No.
A During shutdowns they would work.
Q Is that basically the reason that people would be asked to work more than 10 hours in a given day, that they were in a turnaround situation?
A Shutdowns or if they were working on a project and the project runs over.
Q Do you remember instances at BP Carson or Valero or Mobil/Exxon in which, in sort of a seasonal way, there would be a lot of temporary employees hired in to work?
A Yes.
Q What would cause that -- what would be the context for that?
A Shutdown.
Q Okay. Just taking BP Carson as an example, how many people are we talking about in terms of extra temporary employees that would be hired in?
A 30 guys. 30 or 40 guys.
Q Do you know how those guys were compensated, that is, do you know CONAM's pay practices with regard to the people that were hired in as temporary people?
A I don't know.
Q Okay. Do you have firsthand knowledge of whether or not employees at BP Carson who, in any particular day, were working more than 10 hours, whether they would take a



second meal break?
A I never seen it.
Q Did you ever do it?
A No.
Q Do you know whether or not in that same context, that is, in the context of an employee of CONAM working more than 10 hours in any particular day at any location, do you have any firsthand knowledge of whether they were taking second meal breaks, that is, in places other than where you were stationed?
A No, and I wasn't aware of it.
Q Because you weren't there; is that right?
A I wasn't aware of the second meal break.
Q But do you know one way or another whether or not employees, for instance, at Valero, you know, after you left there, do you know whether or not employees were taking a second meal break there if they were working more than 10 hours?
A No.
Q Would that be true for the other facilities that you were not working at as well; is that right?
A Yes.
Q Okay. I have nothing further.
MR. TINDALL: Okay. I just have a couple follow-ups just on what you were just asking about.



EXAMINATION

BY MR. TINDALL:
Q Is it accurate that you testified that employees working for CONAM at BP Carson either often or frequently worked more than 10 hours a day.
MR. TORRANO: Objection; it lacks foundation.
You can go ahead.
THE WITNESS: Yes.
BY MR. TINDALL:
Q You believe that they were?
A Yes.
Q And I just want to clarify your testimony.
Did you say that -- strike that.
Do you believe that when they worked more than 10 hours in a day, at BP Carson, for CONAM, do you believe that they took a second half-hour meal period?
A No.
MR. TORRANO: Lacks foundation, calls for speculation.
BY MR. TINDALL:
Q You believe that they did not?
A Yes.
MR. TORRANO: Leading.
BY MR. TINDALL:
Q Is that correct?