# EXHIBIT J

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GERALD LEE and STEVE TAYLOR,
individually and on behalf of
all others similarly situated,

    Plaintiffs,

vs.    No. 3:07-CV-044956-SI

CONAM INSPECTION AND
ENGINEERING SERVICES, INC.,

    Defendant.

# ORIGINAL

---

DEPOSITION OF STEVE E. TAYLOR

Los Angeles, California

Thursday, June 12, 2008

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 89462A

**Page 9**

BY MR. TORRANO:
Q How do you do that?
A First by orientating them, giving them the policies and procedures, then throughout the day we go back and walk through the field and make sure their documentation is correct.
Q You're required to keep particular, sort of, safety-oriented documentation in your job as -- one of your duties is to make sure that those records are kept and filed?
A Right.
Q Can you think of anything else you do?
A Training, training, encouraging. I'm part of a program Encourage to Care.
Q Okay. And training -- when you say training, you meaning training as to the procedures to ensure safety?
A Right.
Q You just told me your duties at Wyatt Field Services. Are those essentially your duties at Jacobs Field Services as well?
A Right.
Q Any difference that you could think of between the two companies in terms of your duties, I mean?
A No.
Q Who is your supervisor at Wyatt Field Services?

**Page 10**

MR. TINDALL: Objection; relevance.
You can answer.
THE WITNESS: Steve Tackaberry.
BY MR. TORRANO:
Q How do you spell that?
A Tackaberry, T-a-c-k-a-b-e-r-r-y.
Q How long did you work for Wyatt?
A Roughly about a year. Year -- year and a couple months.
Q Were you a salaried employee there or an hourly employee?
A Hourly.
Q When you worked overtime did you get paid overtime?
A Yes.
Q All right. Where did you work before that?
A CONAM.
Q I have the dates of your employment at CONAM as, listed in my records, from January 2004 to November 2005. Does that sound about right?
A Sounds about right, yeah.
Q Now, the records that I have reflect a job abandonment at CONAM for you. Can you explain that.
MR. TINDALL: I was going to say, wait for the question.

**Page 11**

THE WITNESS: Yes.
BY MR. TORRANO:
Q What happened? Why did you abandon your job?
A Me, abandon my job? No. They did not call me in reference that the work was slow so, therefore, I never was contacted. And I was calling them every day, and they didn't respond.
Q For how long a period of time did you -- strike that.
How many times did you contact CONAM seeking a schedule to work?
A Every day.
Q For what period of time did you do that before you stopped calling?
A Like 7 or 8 days.
Q Did you ever get a termination notice from CONAM?
A No.
Q All right. That was November of 2005. How long was it between November of 2005 and the time you started to work for Wyatt?
A Probably 2 to 3 weeks.
Q So when you didn't get a call back from CONAM, did you just start looking for other work?
A Right.
Q And after 2 or 3 weeks you got the job at Wyatt?

**Page 12**

A Right.
Q Do you think you started at Wyatt sometime in the, sort of, December 2005 time frame?
A Yes.
Q You said you worked there for a year and a few months. Do you remember the time, that is, the month and year, that you started working at Jacobs? We're in -- December of 2005 was the start time for Wyatt, so if you flip forward a year, it would be December of 2006, you add in some months, you're into early 2007. I'm just seeing if that refreshes your memory.
A I'm thinking -- I'm not sure. It might be October, I'm thinking.
Q Of 2006 or '-7?
A '-6. Would it be '-6?
Q Okay. And you're still employed there?
A Yes.
Q All right. I'd like to mark, as Exhibit 1 --
MR. TINDALL: That's fine.
BY MR. TORRANO:
Q -- a document that's entitled "Application For Employment." It's Bates-stamped CON 0026 through 31.
(Defendant Exhibit 1 marked.)
BY MR. TORRANO:
Q Mr. Taylor, if you could just take a quick look

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**Page 13**

1  at Exhibit 1, for purposes of identifying it, and I just
2  mostly want you to authenticate the document.
3      A  Yes.
4      Q  All right. Is this the document, that's been
5  marked as Exhibit 1, the application that you filled out
6  in order to obtain employment at CONAM?
7      A  Yes.
8      Q  All right. If you go to the final page, the one
9  that's Bates-stamped 31, is that your signature?
10     A  Yes.
11     Q  That was dated January 12, 2004?
12     A  Right.
13     Q  Okay. After filling out this application how
14  long was it before you started working for CONAM?
15     A  Probably, I want to say, a week or two.
16     Q  What position did you take at CONAM when you
17  started there?
18     A  Assistant.
19     Q  What kind of position was that?
20     A  Helping the tech, technician.
21     Q  Did you remain in that position while you were
22  working at CONAM?
23     A  Yes.
24     Q  When you say help the technician, what did that
25  entail?

**Page 14**

1      A  It would entail making sure he had all of his --
2  his equipment to do the job, when we were doing x-rays, I
3  would make sure the areas were barricaded and such, set
4  the parameters for the x-ray.
5      Q  Okay. So when you say the tech, is it a tech,
6  x-ray tech that you worked with?
7      A  Right.
8      Q  Did you work in any other capacity while you were
9  at CONAM other than serving as an assistant to x-ray
10  techs?
11     A  No.
12     Q  Was it always the same x-ray tech?
13     A  No.
14     Q  Have you ever -- strike that.
15        If you look on page 3 of the application, it
16  lists your employment history. Are those -- strike that.
17  Is what you have written there accurate?
18        MR. TINDALL: Take a minute to take a look at it
19  before you answer.
20        THE WITNESS: Yes.
21  BY MR. TORRANO:
22     Q  As you look at it do you think you left anything
23  out or is it all there, that is, is it complete in terms
24  of your work history?
25        MR. TINDALL: Objection; vague.

**Page 15**

1        You can answer.
2        THE WITNESS: Yes.
3  BY MR. TORRANO:
4      Q  And if you take a look at the next page on your
5  application it lists your educational history.
6      A  Yes.
7      Q  Is that accurate?
8      A  Yes.
9      Q  All right. As you look over it now is there
10  anything that strikes you as incomplete or inaccurate?
11        MR. TINDALL: Objection; compound.
12        You can answer.
13        THE WITNESS: Everything is accurate.
14  BY MR. TORRANO:
15     Q  Okay. You are a plaintiff in a lawsuit against
16  CONAM currently; you understand that?
17     A  Yes, I do.
18     Q  Have you ever been a plaintiff in any other
19  lawsuit?
20     A  No, I have not.
21     Q  Have you ever sued any other employer?
22     A  No, I have not.
23     Q  Have you ever been a witness in any lawsuit?
24     A  No, I have not.
25     Q  Have you ever filed a workers' compensation

**Page 16**

1  claim?
2      A  No, I have not.
3      Q  Have you ever sought or received unemployment
4  insurance benefits?
5      A  I have.
6      Q  Okay. When was that?
7      A  Probably like eight -- I would have to say '8- --
8  mid-'80s somewhere.
9      Q  What was the context of that?
10        MR. TINDALL: Objection; relevance.
11        You can answer.
12        THE WITNESS: The context of what?
13  BY MR. TORRANO:
14     Q  Of the unemployment that you sought and received.
15     A  Termination. Termination.
16     Q  How long were you unemployed?
17     A  Probably a year.
18     Q  Okay. Do you remember the name of the employer
19  that terminated you?
20     A  CYTEC Fiberite.
21     Q  It appears to be CYTEC that is listed on the
22  first box for your employment history. Is that the
23  company you're referring to?
24     A  Yes, which was -- yeah.
25     Q  Okay. Why were you terminated from CYTEC?

## Page 33

1  Q  All right. Do you know how long he's been
2  employed by CONAM?
3     MR. TINDALL: Objection; calls for speculation.
4     You can answer.
5     THE WITNESS: Probably almost two years.
6  BY MR. TORRANO:
7  Q  Have you ever reviewed any of Mr. Hill's payroll
8  records?
9  A  No.
10 Q  Do you know what his hourly rate of pay is?
11 A  No.
12 Q  Do you have any firsthand knowledge regarding
13 whether or not he works an alternative workweek schedule
14 versus a regular schedule?
15 A  No.
16 Q  Do you know whether or not he's been paid
17 overtime while he works at CONAM?
18 A  No.
19 Q  Do you have any firsthand knowledge of whether or
20 not he does or doesn't take a second meal break to the
21 extent he works more than 10 hours?
22 A  I know the times when we worked together, we
23 wouldn't -- we was not taking a second meal break after
24 the 10th hour.
25 Q  On how many days, to the best of your

## Page 34

1  recollection, did you work with Marcus Hill while you were
2  at CONAM on a day where you worked more than 10 hours?
3     MR. TINDALL: I'm sorry, is the question how many
4  days did they work together more than 10 hours?
5     MR. TORRANO: Well put.
6     MR. TINDALL: Okay.
7     THE WITNESS: Him and I personally together side
8  by side or --
9  BY MR. TORRANO:
10 Q  Correct.
11 A  Numerous times.
12 Q  Any estimate?
13 A  I can't estimate.
14 Q  Okay. During the time when you worked at CONAM
15 on how many occasions would you say or do you recall
16 working more than 10 hours in a day?
17 A  Quite frequently. Anytime that there was a
18 turnaround, there would be days where we worked 7 days a
19 week, 12 hours a day.
20 Q  How often would a turnaround occur?
21 A  I want to say every, probably, 2 to 3 months.
22 Q  What is a turnaround?
23 A  Turnaround is when they tear down the unit and
24 refit it.
25 Q  So when they tear down the unit and refit it,

## Page 35

1  that means it's gone offline, so there's a time urgency --
2  A  Correct.
3  Q  -- so you work as fast as you can?
4     MR. TINDALL: Let him finish his question.
5  BY MR. TORRANO:
6  Q  -- is that correct?
7  A  That's correct.
8     MR. TORRANO: Off the record for a second.
9     (Discussion off the record.)
10    MR. TORRANO: Back on the record.
11 Q  You said you've spoken to Marcus Hill once or
12 twice. Have you told me all the substance of the
13 conversations that you can recall having with Mr. Hill?
14    MR. TINDALL: About this case?
15 BY MR. TORRANO:
16 Q  Yes.
17 A  About this case? Basically what I've shared with
18 you earlier, anything after 8 hours, we should have been
19 paid time and a half, and after the 10th hour, we should
20 have had a second meal break.
21 Q  Did Marcus Hill express any opinion about that or
22 did he just listen to you?
23 A  He just listened.
24 Q  Have you spoken with anyone else that still works
25 for CONAM about this case?

## Page 36

1  A  Cliff.
2  Q  Do you know Cliff's last name?
3  A  I'm not really sure. Maybe Cliff Robertson, but
4  I could be thinking about the Portland Trailblazer guy. I
5  don't know.
6  Q  I won't hold you to it.
7     What location is Cliff in?
8  A  He's at the BP Carson refinery also.
9  Q  What's his position?
10 A  He's a tech. He's also a tech.
11 Q  What kind of tech?
12 A  I think he's a visual -- visual inspection.
13 Q  How many times have you spoken with Cliff about
14 the case?
15 A  Maybe once or twice.
16 Q  Do you recall what he said?
17 A  He just -- I just shared the information. And
18 he's like, really?
19 Q  Do you recall anything else about that
20 conversation?
21 A  No.
22 Q  One thing I never did was really go over the
23 ground rules, and I'll do it in 10 seconds.
24    We have to answer and speak to one another
25 audibly, because the court reporter can only take down

**Page 37**

```
 1  what we actually say. So, whereas you I are used to
 2  nodding our heads and making gestures in response, when
 3  we're in deposition, we need to actually say things out
 4  loud. Does that make sense?
 5    A  Yes.
 6    Q  Your lawyer's already told you a couple times,
 7  but it's important that we not speak at the same time,
 8  because, again, the court reporter, sitting next to us,
 9  finds it literally impossible to write down simultaneous
10  speech. So I will do my best not to talk over you and you
11  have been, and hopefully will continue to do your best not
12  to talk over me. Does that make sense?
13    A  Yes.
14    Q  All right. I presume you're not under the
15  influence of any medication or alcohol or other drugs that
16  would prevent you from giving testimony today?
17    A  That's correct.
18    Q  Okay. After the deposition is concluded the
19  court reporter will compile a booklet with all of the
20  testimony in it. You'll have an opportunity to review
21  that booklet and make corrections to it if you wish. In
22  doing that, keep in mind that if you do make corrections,
23  I will have the opportunity to comment on the fact that
24  you've made corrections and make negative reference to it
25  and suggest a variety of things, perhaps that your
```

**Page 38**

```
 1  recollection wasn't good or that you were not telling the
 2  truth. So the reason I tell you this is so that you
 3  listen as carefully as you can to the questions and give
 4  your best testimony here today.
 5      Do you understand that?
 6    A  Yes.
 7    MR. TINDALL: And, just for the record, we do
 8  reserve the right to review the transcript and make
 9  changes if need be.
10    MR. TORRANO: I understand.
11    MR. TINDALL: I think we have to do that now.
12    MR. TORRANO: Off the record.
13    (Discussion off the record.)
14    MR. TORRANO: Back on the record.
15    Q  Have you asked Cliff Peterson -- strike that.
16      Have you asked Cliff Robertson, if that is his
17  last name, to provide you with any information for
18  purposes of the lawsuit?
19    A  No.
20    Q  I think I asked already, but I'll ask again, have
21  you asked Marcus Hill to provide you with any information?
22    A  No.
23    Q  Have you met with anyone -- strike that.
24      In having your conversations with Marcus Hill,
25  were they in person or on the telephone?
```

**Page 39**

```
 1    A  In person.
 2    Q  Where did they take place?
 3    A  At the BP.
 4    Q  Did you go to BP specifically to speak with
 5  employees regarding the lawsuit?
 6    A  No. I -- I work there at the facility with
 7  Jacobs.
 8    Q  I see. What about Cliff, did you have the
 9  conversation you discussed with me a minute ago in person
10  with him or on the telephone?
11    A  In person.
12    Q  Where was that?
13    A  At BP.
14    Q  Did you happen to be on the BP premises because
15  of work or did you go there to talk about the lawsuit?
16    A  I worked -- I worked at the site.
17    Q  Again, that was with your present employer?
18    A  Jacobs.
19    Q  Okay. Have you spoken with anyone else that
20  currently works for CONAM about the lawsuit?
21    A  No.
22    Q  Did you ever work for CONAM at any facility in
23  Northern California?
24    A  No.
25    Q  In your interrogatory responses it says that you
```

**Page 40**

```
 1  worked at the BP Carson refinery, another BP facility in
 2  Paramount, a pipeline project in Manhattan Beach, perhaps
 3  a Chevron project, and at an AES power plant in
 4  Long Beach. Is that accurate?
 5    A  That's accurate.
 6    Q  All right. Can you give me the time frames, as
 7  best you can recall, that you worked at each one of these
 8  facilities for CONAM. Let's start with BP Carson?
 9    A  Repeat the question, please.
10    Q  Let me try to go through it piece by piece.
11      When you were hired by CONAM did you begin your
12  work at the BP Carson facility?
13    A  Yes.
14    Q  How long did you work at that facility?
15    A  Probably about six.
16    Q  Six months?
17    A  Six, seven months.
18    Q  And remind me what your duties were there?
19    A  Assistant, helping the technician.
20    Q  All right. After the BP Carson facility, that
21  is, after six months, what facility did you next go to to
22  work for CONAM?
23    A  Periodically other jobsites.
24    Q  I see. Were you primarily employed at the
25  BP Carson facility, then periodically you would move out
```

**Page 41**

1  to other sites if necessary?
2  A  Correct.
3  Q  All right. So BP Carson was the primary facility
4  at which you worked. Then when you talk about the BP
5  facility in Paramount, the pipeline in Manhattan Beach and
6  the AES power plant in Long Beach are those locations that
7  you would just be periodically sent out to work at for a
8  shorter period of time?
9  A  Yeah, maybe a week or two on assignments.
10 Q  Did you also work as a tech in those instances?
11 A  Right.
12 Q  Can you recall, as you sit here, the timing of
13 your work at the other locations besides the BP Carson
14 location?
15 A  Each shift was 10-hour days.
16 Q  I wasn't very clear.
17    Can you recall, as you sit here, when it was in
18 time that you were sent out for 1- or 2-week periods to
19 work at these other locations?
20    MR. TINDALL: I'm sorry, you're asking what
21 dates?
22 BY MR. TORRANO:
23 Q  Correct.
24 A  Okay. Thank you. I can't recall the exact
25 dates.

**Page 42**

1  Q  Do you have any recollection, even if it's a
2  ballpark or an estimate? Let me try it this way.
3     You went to work at BP Carson?
4  A  Right.
5  Q  Do you remember the first time that you were sent
6  out to work at some other location?
7  A  Not really.
8  Q  Okay. Was there ever a time where your primary
9  place of employment for CONAM was a location other than
10 BP Carson?
11 A  No.
12 Q  During the time that you worked for CONAM was
13 your rate of pay ever changed?
14 A  Yes.
15 Q  What was it that you started at and when was it
16 changed to and to what?
17    MR. TINDALL: Objection; compound.
18    You can answer.
19    THE WITNESS: My starting wage was $10, and when
20 I received an increase, it went from 10 to 12.
21 BY MR. TORRANO:
22 Q  Do you remember when that happened?
23 A  I could say maybe in the month of October.
24 Q  Were you considered, to the best of your
25 knowledge, a permanent employee at CONAM or were you an

**Page 43**

1  on-call employee at CONAM?
2  A  It got to a -- I became permanent.
3  Q  How did you start?
4  A  I started like temporary, until something came
5  available for permanent.
6  Q  When was that?
7  A  When I started working at the BP refinery.
8  Q  Do you remember what month that was?
9  A  Honestly, no.
10 Q  Okay. Did the way you were paid change -- strike
11 that.
12    Did the way you were paid change when you were
13 made a permanent employee?
14 A  No.
15 Q  Same hourly rate?
16 A  Same hourly rate.
17 Q  Same schedule?
18 A  Same schedule.
19 Q  Before you became a permanent employee did you
20 work sometimes and not work other times depending on
21 whether you were called up from the office?
22    MR. TINDALL: Objection; vague and ambiguous.
23    THE WITNESS: Correct.
24 BY MR. TORRANO:
25 Q  For how long did that go on, that is, how long

**Page 44**

1  were you employed at CONAM where you were essentially on
2  call?
3  A  Going -- it would be like every other week.
4  Let's say they would get a job assignment, and I'll give
5  you an example, the one in Manhattan Beach, for the
6  pipeline, that following week, there's a slot that opens
7  up at BP where it requires me to go back to the BP site.
8  Q  All right. What I'm trying to get a sense of is
9  this, you were employed beginning January of 2004.
10 A  Okay.
11 Q  When you first went to work there, you were, sort
12 of, a temporary employee?
13 A  Correct.
14 Q  Okay. How many weeks or months did that
15 continue, to the best of your memory, until you became a
16 permanent employee?
17 A  About 3 -- 3 months.
18 Q  Okay. So you ended up being a permanent employee
19 from March or April of 2004; is that right?
20 A  Right.
21 Q  Okay. On average during the period you were a
22 temporary employee how often would you say you were
23 employed, that is, how often did you get work day to day?
24 A  Day to --
25    MR. TINDALL: Objection; vague.

**Page 45**

1  You can answer.
2  THE WITNESS: Like once a week.
3  BY MR. TORRANO:
4  Q  Once a week you'd get a day?
5  A  A day or two, sometimes three days.
6  Q  All right. Once you became permanent were there
7  periods of time in which CONAM did not employ you because
8  there was no work or because they simply didn't call you?
9  A  There was times.
10 Q  How often did that happen?
11 A  A little uncertain. Can't actually put a time
12 frame on it.
13 Q  Do you have any estimate of how often it would be
14 the case that you simply wouldn't have work to do?
15 A  Like once a week or so sometimes.
16 Q  Once a week you'd have a day that you weren't
17 called in?
18 A  Yeah.
19 Q  Okay. Did that remain the case throughout the
20 rest of the time you worked at CONAM?
21 A  Yes.
22 Q  Okay. How did you know what your schedule was
23 going to be at CONAM?
24 A  Well, we -- at CONAM, a lot of times, when we
25 worked at BP, our schedule will consist of 4 days,

**Page 46**

1  10 hours a day.
2  Q  You were on a 4-10?
3  A  Right. That's the regular schedule. Once you're
4  on that site, that's your schedule.
5  Q  Have you ever heard of a callout or a callout
6  job?
7  A  Yeah.
8  Q  What does that refer to?
9  A  Like, for the example I just gave you, let's say
10 the Manhattan Beach project, the pipeline, that's a
11 callout.
12 Q  And you did those kinds of jobs?
13 A  Correct.
14 Q  When you would do a callout job, what would your
15 schedule be?
16 A  Anywhere from 10 to 12 hours, depending on the
17 job assignment.
18 Q  Was it ever less?
19 A  No.
20 Q  Did you ever get overtime pay during the time you
21 worked at CONAM?
22 A  Yes.
23 Q  Under what circumstances?
24 A  Anything after the 40th hour would become
25 overtime.

**Page 47**

1  Q  Okay. And at what rate of pay did you get
2  overtime at any hour over the 40th hour?
3  A  Time and a half.
4  Q  Did you ever get paid double time when you worked
5  at CONAM?
6  A  Yes.
7  Q  Under what circumstances?
8  A  Anything after the 10th hour.
9  Q  In a particular day?
10 A  Right.
11 Q  Okay. Do you know whether or not the way your
12 pay was calculated, in relationship to overtime versus
13 nonovertime, do you have any recollection or any knowledge
14 of whether it was different based on a callout job versus
15 a job that you were doing at BP Carson?
16    MR. TINDALL: Objection; vague.
17    You can answer if you understand.
18    THE WITNESS: Repeat it again, please.
19 BY MR. TORRANO:
20 Q  Do you know one way or another whether the way
21 your pay was calculated in regards to overtime would be
22 different to the extent you were working at BP Carson
23 versus on a callout job?
24 A  The rate was the same.
25 Q  The rate of pay was the same?

**Page 48**

1  A  The rate of pay was the same.
2  Q  Was there any difference in terms of how overtime
3  would be calculated, to your knowledge?
4  A  No.
5  Q  Okay. Do you know whether or not that was true
6  for other employees at CONAM?
7  A  No.
8  Q  Okay. Just to be clear, did you ever -- strike
9  that.
10    While you worked at CONAM were you aware of
11 payroll practices at Conam's facilities in Northern
12 California?
13 A  No.
14 Q  Do you know whether or not CONAM at any point
15 conducted an alternative workweek schedule election at any
16 of its locations?
17 A  No, I do not.
18 Q  Were there times at CONAM when CONAM would staff
19 up because of increased workload?
20    MR. TINDALL: Objection; vague.
21    You can answer.
22    THE WITNESS: Turnarounds.
23 BY MR. TORRANO:
24 Q  Turnarounds?
25 A  Correct.

**Page 49**

1  Q  And those, you said, happened every three months
2  or so?
3  A  Two to three months.
4  Q  Was that turnaround at the Carson facility or at
5  other facilities as well?
6  A  Other facilities as well, but at the BP Carson
7  site also.
8  Q  So every two to three months there would be an
9  increase in hiring; is that right?
10  A  Correct.
11  Q  Did you have a sense of how many people would get
12  hired in to handle those circumstances?
13  A  Depending on the --
14     MR. TINDALL:  I was going to say, objection;
15  calls for speculation.
16     You can answer.
17     THE WITNESS:  Depending on the size of the task.
18  BY MR. TORRANO:
19  Q  Do you have any memory of how much the work force
20  would increase for any particular turnaround while you
21  worked at CONAM?
22  A  There are times where you get additional 10 to 30
23  people.
24  Q  And 10 to 30 people in addition to how many?
25  A  That was already at the site?

**Page 50**

1  Q  Yeah.
2  A  10 to 30, that's --
3  Q  So you kind of doubled in size?
4  A  Yeah.
5  Q  How long would those folks be around?
6  A  Through the course of the turnaround, however
7  long the turnaround lasted.
8  Q  Generally speaking, if there's a way you can do
9  that, can you generalize as to how long a turnaround would
10  typically take?
11  A  Anywhere from 2 to -- 2 weeks to a month,
12  sometimes month and a half.
13  Q  Do you know whether the individuals who were
14  hired in to handle the turnarounds were paid overtime?
15  A  Any -- repeat the question.
16  Q  Do you know whether or not the people who were
17  hired in on a temporary basis to handle turnarounds were
18  paid overtime by CONAM?
19  A  Yes.
20  Q  Were they?
21  A  After 10 hours -- after -- yes.
22  Q  Let me ask it a different way.  Do you know
23  whether or not CONAM paid the temporary people that were
24  hired in based on an 8-hour day versus a 10-hour day?
25     MR. TINDALL:  Objection to the extent it calls

**Page 51**

1  for a legal conclusion.
2     You can answer.
3     THE WITNESS:  Based on 10 hours.
4  BY MR. TORRANO:
5  Q  How do you know that?
6  A  Anything over 10 hours was considered overtime.
7  Q  All right.  I understand that your testimony is
8  that anything in excess of 10 hours was considered
9  overtime because you were working a 4-10.
10  A  Correct.
11  Q  Okay.  What I'm asking is:  Do you know whether
12  or not these additional people that were hired in
13  periodically were working under the same practice as that?
14     MR. TINDALL:  Objection; asked and answered.
15     You can answer.
16     THE WITNESS:  Yes.
17  BY MR. TORRANO:
18  Q  How do you know that?  Did you ever review any of
19  their payroll records?
20  A  No.
21  Q  Did you ever talk to any of them about how they
22  were being paid?
23  A  No.
24  Q  Are you just sort of assuming that they were paid
25  on the same basis as you?

**Page 52**

1  A  Yes.
2  Q  Okay.  During the time that you were stationed at
3  BP Carson how many full-time permanent CONAM employees
4  were employed there, when I say that, I mean to exclude
5  these, sort of, surge employees that would come in
6  periodically for turnarounds, but how many of you folks
7  were there permanently?
8  A  Probably 15 to 30.
9  Q  What would make the difference between it being
10  15 versus 30, was that a matter of whether people had been
11  sent out to do callout jobs?
12  A  That, and maybe at a different site.
13  Q  Might just move to a different site?
14  A  Correct.
15  Q  But during the time that you worked there, it was
16  between 15 and 30 people that were working with you?
17  A  Correct.
18  Q  All right.  When you did callout work to
19  BP Paramount, the pipeline in Manhattan Beach, the AES
20  power plant in Long Beach, was that typically just you and
21  one other guy going with you?
22  A  Correct.
23  Q  Okay.  And at these other locations were you
24  aware that there were any other CONAM employees that were
25  stationed at these locations permanently, or was it just

**Page 53**

1  typically you and your --
2     A  Technician.
3     Q  -- technician going out and you were the only
4  CONAM people out there?
5     A  Right.
6     Q  Is that how it was?
7     A  Right.
8     Q  Did anyone ever tell you that you should not be
9  taking a second meal period while you worked at CONAM?
10    A  Repeat the question.
11    Q  Did anyone ever tell you that you should not be
12 taking a second meal period while you worked at CONAM?
13    A  No.
14    Q  I'd like to mark, as Exhibit 2, a document
15 entitled "Acknowledgement" and it's Bates-stamped
16 CON 0032.
17      (Defendant Exhibit 2 marked.)
18 BY MR. TORRANO:
19    Q  Mr. Taylor, is that your signature on the
20 document?
21    A  That sure is.
22    Q  That was noticing your receipt of the handbook?
23    A  Yes.
24    Q  I'd like to mark, as Exhibit 3, a document that
25 is Bates-stamped CON 0267 through 0313. It's a handbook.

**Page 54**

1       (Defendant Exhibit 3 marked.)
2  BY MR. TORRANO:
3     Q  If I could ask you to turn to page 12 of the
4  handbook. When I say "12" I'm referring to the page
5  number that's actually on the handbook. Mr. Taylor, if
6  you could take a look at the section that's entitled "Work
7  Schedules."
8     A  Okay.
9     Q  Have you had a chance to read that first
10 paragraph?
11    A  Yes.
12    Q  Does that comport with your recollection of how
13 the work schedules worked while you worked at CONAM?
14    A  Yes.
15    Q  If you could look at the Standard Workweek
16 section as well.
17    A  All right.
18    Q  I'll just ask you the same question. Does that
19 comport with your recollection of how the standard
20 workweek worked at CONAM?
21    A  Correct.
22    Q  Okay. If I could have you read section B.
23      MR. TINDALL: On the next page.
24 BY MR. TORRANO:
25    Q  Yes, on page 13. Thanks, Steven.

**Page 55**

1     A  B, Breaks.
2     Q  Breaks. If you could just read that.
3     A  Aloud?
4     Q  No. Just read it to yourself.
5       Does that comport with your memory of how lunch
6  breaks worked at CONAM?
7     A  Correct.
8     Q  You'll see the last sentence there says,
9       "Additional breaks may be
10     scheduled at the discretion of your
11     supervisor and in accordance with
12     applicable state laws."
13      To the extent state law called for a second meal
14 break after 10 hours, why didn't you take one?
15    A  I was never told that I was allowed to take a
16 second lunch.
17    Q  Okay. Did anyone that worked with you take a
18 second lunch?
19    A  No.
20    Q  Did anyone who worked for BP at the BP Carson
21 facility take second lunch breaks, to your knowledge?
22    A  No.
23    Q  All right. If you could take a look at section
24 C, right under Breaks.
25    A  Okay.

**Page 56**

1     Q  And read that. I'm going to ask you the same
2  question about it.
3       Does that comport with your recollection of the
4  pay practices for overtime at CONAM?
5     A  Correct.
6       MR. TINDALL: Objection to the extent it calls
7  for a legal conclusion.
8  BY MR. TORRANO:
9     Q  Just to recap, I want to make sure I understand
10 this, you have a recollection of how it is that you were
11 paid overtime while you worked at CONAM?
12    A  Correct.
13    Q  You have a belief, but it's an assumption, that
14 others who worked there were paid the same way that you
15 were?
16      MR. TINDALL: Objection; misstates his testimony.
17      THE WITNESS: Correct.
18 BY MR. TORRANO:
19    Q  Okay. We've talked about callout jobs and we've
20 talked about, I'll call it, a surge in the number of
21 employees when you had turnaround situations --
22    A  Correct.
23    Q  -- during which nonpermanent employees were
24 brought in to speed up the process, and then we've talked
25 about regular work, that is, a person who's permanently

**Page 65**

Q When was the next discussion you had with her after the town -- after the union hall meeting?
A She discussed that she was --
MR. TINDALL: I'm going to instruct you not to reveal any communications after the town hall, or the union hall meeting.
BY MR. TORRANO:
Q I'm asking when the next discussion was.
A It was over the phone.
Q Do you remember how long, in terms of days or hours or weeks, it was after the union hall meeting?
A Like one to two weeks.
Q Is that the same circumstance in which you signed the engagement letter?
A Yes.
Q Were there any discussions with Ellen between the union hall meeting and the phone conversation in which you dealt with the engagement letter?
A Repeat that, please.
Q Were there any other conversations in between the union hall meeting and the time that you signed the engagement letter between you and Ellen?
A Yes.
Q When was that?
A Within that 1- to 2-week time frame.

**Page 66**

Q How many conversations did you have with Ellen after the union hall meeting up to the time that you signed the engagement letter?
A 1 to 2 -- 2 weeks.
MR. TINDALL: No. How many times did you talk to her?
BY MR. TORRANO:
Q How many times did you talk to her? On how many occasions did you talk to her?
A I want to say three to four.
Q Were they all on the phone?
A Yes.
Q Prior to the filing of this complaint, which is September 25, 2007, had you ever met with Steven Tindall, that is your lawyer that's sitting next to you?
A Repeat that again, please.
Q Prior to the time that this complaint got filed had you met with Steven Tindall?
A No.
Q Prior to the time that this complaint was filed had you ever spoken with Mr. Tindall?
A No.
Q At some point you retained Mr. Tindall to be your lawyer as well. Do you recall when that was?
A Not exactly.

**Page 67**

Q Do you have a ballpark estimation?
A Not exactly. I don't -- not exactly.
Q Do you have any memory of it at all, that is, do you think it was last week or do you think it was a year ago? I'm just looking for your best recollection even if it's not specific --
A Okay.
Q -- of when it was that you retained Mr. Tindall to represent you in this lawsuit along with Ellen Moskowitz?
A I would say roughly a couple months.
Q Okay. A couple months after the complaint got filed?
A Right.
Q Going back to the work you did on callouts.
A Right.
Q Who assigned you to do a callout, that is, if you were going along, doing your thing at BP Carson, and then at some point you ended up on a callout at one of these other locations, how did you learn that you were going to do a callout job?
A Office personnel.
Q Who would that be?
A One of the office personnel persons.
Q Do you know the title of the person?

**Page 68**

A I would just say office personnel supervisor.
Q Was it your supervisor that would tell you?
A At that particular time, yeah.
Q Was there some other practice at some other time?
A No.
Q Okay. So I guess I'm just trying to understand. If you were going about your business at BP Carson --
A Okay.
Q -- and then it would come to pass that you'd end up doing a callout with your technician?
A Right.
Q Who told you that you were going to do that callout?
A It would be the supervisor.
Q Your supervisor?
A Right.
Q You've already told me the two supervisors you had there. So it would be either one of those two fellows?
A Right.
Q All right. Did they also tell you what the schedule would be for the callout?
A For the callout, occasionally, yes.
Q Were there times when they did not tell you what the schedule would be?

**Page 69**

1  A  Yes.
2  Q  If they did not tell you, how did you know what
3  the schedule would be?
4  A  It would sometimes come through the technician,
5  he would get the word from the office personnel being able
6  to communicate with me that I would be working with that
7  individual.
8  Q  I see. Do you know whether or not Conam's pay
9  practices, when I say "pay practices" I mean practices
10 with regard to paying overtime, do you know whether or not
11 Conam's pay practices varied from work site to work site?
12 A  No.
13 Q  Do you know whether or not Conam's -- strike
14 that.
15     Do you know whether or not individual CONAM
16 employees taking second meal breaks varied from CONAM work
17 site to work site?
18 A  No.
19 Q  Do you know how many CONAM employees were
20 employed in Northern California during the time that you
21 worked for CONAM down here?
22 A  No.
23 Q  Did you know any of those fellows up there?
24 A  No.
25 Q  Since you filed this lawsuit have you talked to

**Page 70**

1  anybody who worked in that area up there?
2  A  No.
3  Q  When I say "that area up there" I mean Northern
4  California.
5  A  Right.
6  Q  Okay. As to BP Carson, do you know how many
7  employees worked for BP at the BP Carson facility prior to
8  the time you started working for CONAM?
9      MR. TINDALL: CONAM employees?
10 BY MR. TORRANO:
11 Q  Correct.
12 A  CONAM -- I believe the number I've given you
13 earlier, 15 to 30 people at the --
14 Q  So at the time you joined, you think that was
15 about the number?
16 A  Yes.
17 Q  Was that about the number at the time that you no
18 longer worked there?
19 A  Right.
20 Q  In the years prior to that do you know how many
21 people worked there?
22 A  No.
23 Q  I mean, for instance, 2001, 2003, 2004, do you
24 know how many people worked there during those years?
25 A  No, I do not.

**Page 71**

1  Q  Then since you left in 2005, do you know how many
2  people are working there in 2006, 2007, 2008?
3  A  No.
4  Q  Okay. There are BP employees that work at
5  BP Carson, correct?
6  A  That's correct.
7  Q  All right. Do you know how many BP employees
8  were employed by BP at the BP Carson facility during the
9  time you were working there for CONAM?
10 A  No, I do not.
11 Q  Any estimate?
12 A  No, I do not.
13 Q  Do you know what their -- do you know what BP's
14 pay practices were with regard to its employees there?
15 A  No, I do not.
16 Q  Do you know whether or not BP employees at the
17 Carson facility took second meal breaks, to the extent
18 they worked over 10 hours?
19 A  No, I do not.
20 Q  You said you worked a 4-10 while you worked at
21 BP Carson?
22 A  This is correct.
23 Q  All right. Do you know whether or not BP itself
24 required a 4-10 schedule of the CONAM employees that were
25 working on the BP property?

**Page 72**

1  A  No, I do not.
2  Q  Have you ever heard that?
3  A  No.
4  Q  Did the BP employees at the BP Carson facility
5  also work 4-10s, to your knowledge?
6      MR. TINDALL: Objection; calls for speculation.
7      You can answer.
8  BY MR. TORRANO:
9  Q  Or do you know?
10 A  I don't know.
11 Q  Do you know why it is that CONAM set a 4-10
12 schedule at the BP facility in Carson?
13     MR. TINDALL: Objection; lack of personal
14 knowledge.
15     THE WITNESS: No, I do not. It was a routine
16 schedule, 4-10s, sometimes 5-10s, sometimes 6-10s a week.
17 BY MR. TORRANO:
18 Q  What would make the difference in your schedule,
19 as far as you know, as to why you'd be working a 5-10 or
20 6-10, or some other schedule, versus the 4-10?
21 A  The amount of work in certain units or certain
22 units needing more attention than others.
23 Q  Were you ever informed by anyone orally at CONAM
24 that you were working an alternative workweek schedule?
25 A  No.

18 (Pages 69 to 72)

**Page 81**

1  Q  Okay. In your interrogatory responses we asked a
2  series of questions about the various aspects of the
3  lawsuit, and then in relation to that -- and that's in
4  relation to such things as claims for overtime and claims
5  for the second meal period, and then we asked -- we asked
6  you to identify all persons that you alleged were either
7  entitled to overtime pay or entitled to the second meal
8  break.
9  A  Okay.
10  Q  In response to that, I'm just going to show this
11  to you, we've got a big, old, long list of names.
12  A  Right.
13  Q  Do you see that? Don't read my notes.
14  A  Yes.
15  Q  Do you know how those names were compiled?
16  MR. TINDALL: You can answer yes or no, but I'd
17  caution you not to reveal anything discussed between you
18  and me.
19  BY MR. TORRANO:
20  Q  Let me ask it this way. Did you compile the list
21  of names?
22  A  No.
23  Q  Your attorneys compiled the list of names?
24  A  Yes.
25  Q  Trying to find -- is it safe to say that when you

**Page 82**

1  glance down through this list of names, that you don't
2  know who most of these people are?
3  A  I don't know most of these. There are some names
4  on there that I -- I probably can point out.
5  Q  Are those the names of the people that you worked
6  with at BP Carson?
7  A  Yes.
8  Q  But other than that, you don't know who these
9  other people are?
10  A  Correct.
11  Q  Okay. You don't know what positions they hold?
12  A  No.
13  Q  You don't know whether they took second meal
14  breaks?
15  A  No.
16  Q  You don't know whether they got paid overtime?
17  MR. TINDALL: You're asking about the people who
18  he does not know?
19  BY MR. TORRANO:
20  Q  Correct.
21  A  Correct.
22  Q  Is that right?
23  A  Right.
24  MR. TORRANO: Okay. I think the witness has
25  actually testified that he doesn't know with regard to

**Page 83**

1  overtime about anybody.
2  MR. TINDALL: Actually, I don't think he
3  testified to that.
4  BY MR. TORRANO:
5  Q  Let me ask you that. Do you know whether the
6  people that you worked with got paid overtime? Did you
7  review their pay stubs?
8  A  No.
9  Q  No, okay. Do you have any firsthand knowledge of
10  whether they got paid overtime or not?
11  A  No.
12  Q  Okay. What you do know is that you were all
13  working a 4-10, generally speaking?
14  A  That's correct.
15  Q  Okay. With regard to lunch breaks, do you have
16  any direct knowledge of whether second meal breaks were
17  being taken by the people you worked with at BP Carson?
18  A  Rephrase the question.
19  Q  Do you have any direct knowledge of whether the
20  folks that you worked with at BP Carson were taking their
21  second meal breaks if they worked over 10 hours?
22  A  No.
23  MR. TINDALL: I'm sorry, can you define "direct
24  knowledge." I don't know if he understands what you mean.
25  MR. TORRANO: I think he understood. I'll try to

**Page 84**

1  make it clear.
2  Q  What I mean by "direct knowledge," I mean do you
3  actually know. I mean, we always -- we assume things, we
4  presume things, we are aware of things. And what I'm
5  asking for, in this question, is whether you have actual
6  direct knowledge of whether they took a second meal break
7  when they worked over 10 hours?
8  MR. TINDALL: People that he worked with at
9  BP Carson?
10  MR. TORRANO: Right.
11  Q  Is that the way you understood it?
12  A  Right.
13  Q  Okay. I may have already asked you this, so
14  forgive me, you worked at BP Carson primarily, unless you
15  were on a callout. Do you know how many people were
16  employed by CONAM at any of the other facilities in
17  California?
18  A  No, I do not, sir.
19  Q  Have you ever reviewed your own payroll
20  records --
21  A  Yes.
22  Q  -- from CONAM?
23  A  Yes.
24  Q  It that in the context of this lawsuit?
25  A  Yes.

**Page 85**

Q Did you see anything in those payroll records that you thought to be inaccurate?
A No.
MR. TORRANO: Off the record.
(Discussion off the record.)
MR. TORRANO: Back on the record.
Q Back to the issue of the union hall meeting with Ellen, for the third or fourth time.
Did Ellen tell you why she had come to that meeting?
A No.
Q Did Gerald Lee know the shop steward that was involved in the conversation with Ellen?
A No.
Q Did you know the shop steward?
A No.
Q Do you know whether -- strike that.
I have nothing further.
MR. TINDALL: I've got a couple follow-ups.
EXAMINATION
BY MR. TINDALL:
Q Mr. Taylor, earlier you testified about people at CONAM and their work schedules. Do you recall that?
A Yes.
Q Do you believe that the other CONAM employees at

**Page 86**

BP Carson were working 4-10 schedules?
A Yes.
Q Why do you believe that?
A I visually would see them there.
Q Is there -- did you have a reason to believe they were working a schedule similar to yours?
A Yes.
Q Why?
A Because that was the routine schedule at BP, 4-10s.
Q Okay. Earlier Mr. Torrano asked you about second meal periods. Do you recall him asking you about that?
A Yes.
Q Do you believe other CONAM employees at BP Carson were taking second meal periods when they worked more than 10 hours in a day?
A No.
Q Why do you believe they weren't?
A They wouldn't be scheduled. No one would ever take a second meal break.
Q Did you ever see anybody taking a second meal break?
A No.
Q In the schedule you received, was there -- did you ever have a schedule in which a second meal period was

**Page 87**

provided?
A No.
Q Do you know if anyone else at the BP Carson facility that worked for CONAM had a second meal period scheduled?
A No.
Q Earlier you testified about a retention letter, retainer document in which you retained Ellen Moskowitz to represent you in this suit. Do you recall talking about that?
A Yes.
Q Do you know whether my firm, which is Rukin Hyland Doria & Tindall, was also on that retention letter?
A Yes.
Q Do you know if you signed that retention letter before the complaint was filed?
A I signed it before the complaint was filed.
Q Are you sure about that?
A Yes.
Q Okay. I'm going to ask a couple questions about the union hall meeting as well.
When you were talking to Ellen at the union hall was there a point in the conversation when you were seeking legal advice about your rights as an employee?
MR. TORRANO: I'll object as leading.

**Page 88**

THE WITNESS: Yes.
BY MR. TINDALL:
Q And a similar question, you testified that you talked to her after that meeting on the phone, correct?
A Correct.
Q Were you asking her for legal advice about your rights as an employee then as well?
MR. TORRANO: Object as leading.
THE WITNESS: Yes.
BY MR. TINDALL:
Q At some point did you ask Ellen to represent you in a case against CONAM?
A Yes.
Q Did you ask her or did she ask you?
A I asked her.
Q Earlier Mr. Torrano asked you about whether Ms. Moskowitz talked to you about being a class representative. Do you recall testifying about that?
A Yes.
Q Do you know if she talked to you about that before you asked her to represent you or after?
A After.
Q Are you sure about that?
A Yes.
MR. TINDALL: I have nothing further.