1 | MARCUS A. TORRANO (SBN 138874)
CANDACE S. BERTOLDI (SBN 254725)
2 | **FULBRIGHT & JAWORSKI L.L.P.**
555 South Flower Street, 41st Floor
3 | Los Angeles, California 90071
Telephone:     (213) 892-9200
4 | Facsimile:     (213) 892-9494
mtorrano@fulbright.com
5 | cbertoldi@fulbright.com

6 | Attorneys for Defendant
CONAM INSPECTION AND ENGINEERING
7 | SERVICES, INC.

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10

11 | GERALD LEE and STEVEN TAYLOR,        )        CASE NO.: C-07-4956-SI
individually and on behalf of all others similarly  )
12 | situated,                                      )
                                                   )        **DEFENDANT CONAM INSPECTION**
13 |                    Plaintiffs,                 )        **AND ENGINEERING SERVICES,**
                                                   )        **INC.'S OPPOSITION TO**
14 |          v.                                    )        **PLAINTIFFS' MOTION FOR CLASS**
                                                   )        **CERTIFICATION**
15 | CONAM INSPECTION AND ENGINEERING     )
SERVICES, INC.,                                    )        [CONCURRENTLY FILED WITH
16 |                                                )        EVIDENTIARY OBJECTIONS TO
                   Defendant.                       )        PLAINTIFFS' MOTION FOR CLASS
17 |                                                )        CERTIFICATION; DECLARATION OF
                                                   )        CANDACE BERTOLDI; AND
18 |                                                )        OPPOSING DECLARATIONS OF
                                                   )        NUMEROUS CONAM RELATED
19 |                                                )        PARTIES]
                                                   )
20 |                                                )        **Date:    October 3, 2008**
                                                   )        **Time:    9:00 a.m.**
21 | _____            )        **Crtrm:   10**
                                                            **Judge:  Hon. Susan Illston**
22

23

24

25

26

27

28

OPPOSITION TO CLASS CERTIFICATION
MOTION Case No. C-07-4956-SI

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION/SUMMARY OF ARGUMENT ................................................... 1

II. FACTUAL BACKGROUND .................................................................... 3

    A.  Conam Performs Work At Numerous Worksites Throughout the State of California ......................................................................................... 3

        1.  Ongoing Contracts ............................................................................ 4

        2.  Temporary or "Episodic" Contracts ................................................ 4

    B.  Conam Employs A Divergent Workforce And Employee Schedules Depend Upon The Worksite To Which Each Employee Is Assigned And Their Individual Employment Status ................................................... 5

        1.  Employees Permanently Assigned To A Refinery ........................... 5

        2.  Call-Out Employees ......................................................................... 6

        3.  Temporary Employees ...................................................................... 6

    C.  Conam's Payroll Practices Vary From Worksite-to-Worksite And From Employee-to-Employee ................................................................... 7

        1.  Employees Permanently Assigned To A Refinery ........................... 7

        2.  Call-Out Employees ......................................................................... 8

        3.  Temporary Employees ...................................................................... 9

        4.  Conam Has Conducted Alternative Workweek Elections .............. 9

    D.  Conam's Meal Period Policy Complies With California Law ............... 10

III. LEGAL STANDARD .......................................................................... 11

IV. THE COURT SHOULD DENY CERTIFICATION BECAUSE INDIVIDUAL INQUIRIES PREDOMINATE ............................................. 12

    A.  Plaintiffs' Meal Period Claim Is Inappropriate For Class Certification Because Individual Issues Necessarily Predominate. ........................... 12

        1.  The Brinker Decision Forecloses Certification of Plaintiffs' Meal Period Class ...................................................................... 12

        2.  The Direct Evidence And Declarations Before The Court Compel The Conclusion That Conam's Policy Was Lawful; Therefore, Certification Should Be Denied. ............................................. 13

            a.  Plaintiffs' Evidence Is Incompetent, And Conclusory, And Fails To Show That Certification Is Appropriate ................. 14

            b.  Conam's Declarations Clearly Demonstrate That The Meal Period Policy Was And Is Lawful ............................... 15

        3.  Any Alleged Meal Period Violations Raise Individualized Issues Of Fact That Cannot Be Determined On A Class-Wide Basis; Therefore, Certification Must Be Denied ........................ 16

            a.  Plaintiffs' Evidence Fails To Demonstrate Common Issues ......... 16

            b.  Individual Issues Of Fact Predominate ................................ 17

DOCUMENT PREPARED ON RECYCLED PAPER

**TABLE OF CONTENTS**
**(continued)**

Page

B.  Plaintiffs' Overtime Claim Is Inappropriate For Class Certification Because Individual Issues Necessarily Predominate ...................................................18

    1.  Whether Employee Were Properly Paid Overtime Involves Significant Individualized Factors That Cannot Be Determined On A Class-Wide Basis .............................................................................18

    2.  Conam's Varied Payroll Practices Preclude Determination Of Overtime Liability By Class Action ........................................................19

V.  CERTIFICATION SHOULD BE DENIED BECAUSE A CLASS ACTION WOULD NOT BE A SUPERIOR METHOD OF ADJUDICATING THIS CONTROVERSY ..............................................................................................20

A.  The Superiority Requirement Fails As Adequate Alternatives Exist. ...................21

B.  Class Treatment of Plaintiffs' Class and Sub-Class Is Not A Superior Method Of Adjudication ............................................................................21

VI.  PLAINTIFFS' SUB-CLASS IS VAGUE, AMBIGUOUS, AND SUFFERS FROM THE SAME DEFECTS THAT RENDER PLAINTIFFS' CLASS UNCERTIFIABLE ...................................................................................22

VII.  CONCLUSION .....................................................................................................23

DOCUMENT PREPARED
ON RECYCLED PAPER

1

# **TABLE OF AUTHORITIES**

2

**Page**

3

### CASES

4

Bell v. Farmers Ins. Exchange,
    115 Cal. App. 4th 715 (2004), .............................................................21

5

Blackie v. Barrack,
    524 F.2d 891 (9th Cir. 1975) ..............................................................12

6

Blackwell v. Skywest Airlines,
    245 F.R.D. 453 (S.D. Cal 2007) ..........................................................16

7

Brinker Restaurant Corporation, et al. v. Superior Court
    of San Diego County (Hohnbaum), No. D049331,
    2008 Cal. App. LEXIS 1138 (Cal. Ct. App. July 22, 2008) ............................passim

8

9

Brown, et al. v. Fed. Express Corp.,
    249 F.R.D. 580 (C.D. Cal. 2008) .........................................................16

10

Hicks v. Kaufman & Broad Home Corp.,
    89 Cal. App.4th 908 (2001). ...............................................................12

11

Jimenez v. Domino's Pizza, Inc.,
    238 F.R.D. 241 (C.D. Cal. 2006) .........................................................18

12

Lanzarone v. Guardsmark Holdings, Inc.,
    2006 U.S. Dist. LEXIS 95785 (C.D. Cal. 2006)...................................passim

13

14

Lolley v. Campbell,
    28 Cal. 4th 367 (2002) .....................................................................21

15

Maddock v. KB Homes,
    248 F.R.D. 229 (C.D. Cal. 2007) .........................................................20

16

Valentino v. Carter-Wallace, Inc.,
    97 F.3d 1227 (9th Cir. 1996) ..............................................................11

17

18

Zinser v. Accufix Research Inst. Inc.,
    253 F.3d 1180, as amended,
    273 F.3d 1266 (9th Cir. 2001) .......................................................11, 12

19

20

### RULES

21

Federal Rules of Civil Procedure
    Rule 23..............................................................................passim

22

23

24

25

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

# I.    INTRODUCTION/SUMMARY OF ARGUMENT

Plaintiffs seek to certify a putative class of all persons who worked for Conam Inspection and Engineering Services, Inc. ("Conam") in California as non-exempt employees in an inspection or testing occupation at any time from September 25, 2003 to the present, and a subclass of "these inspection and testing employees who were assigned to a particular work location." Certification of both the class and sub-class is inappropriate.

In an attempt to obtain class certification in this case, Plaintiffs' Motion baldly oversimplifies the facts and issues before the Court.  First, Plaintiffs erroneously assert that Conam has a **uniform** policy of failing to provide a second meal period to its employees. Plaintiffs' assertion, however, is only possible if the Court completely ignores the unique and divergent facts in this case, and the recent California Court of Appeal decision in *Brinker Restaurant Corporation, et al. v. Superior Court of San Diego County (Hohnbaum)*, No. D049331, 2008 Cal. App. LEXIS 1138 (Cal. Ct. App. July 22, 2008).

The *Brinker* decision unequivocally answered two long-standing issues under California employment law.  First, the *Brinker* Court declared that employers need only ***provide*** – and ***do not have to ensure*** – that meal and rest periods are taken.  *Brinker*, 2008 Cal. App. LEXIS 1138, at *4 (emphasis added).  Second, the *Brinker* Court held that because "rest and meal breaks need only be 'made available' and not 'ensured,' individual issues predominate."  Thus, class certification was not appropriate. *Id.*  Conam's policy clearly provides that meal breaks are to be taken in accordance with California law.  Given this lawful meal period policy, a determination of Conam's liability for allegedly failing to provide a second meal period, if any, requires an entirely individualized analysis of factors unique to each employee, to wit:

(1)    Whether the employee was even entitled to a second meal break (i.e., whether each employee worked more than ten hours in a single day);

(2)    Whether Conam ***provided*** each employee with the ***opportunity*** to take a second meal break;

OPPOSITION TO CLASS CERTIFICATION
MOTION Case No. C-07-4956-SI

1        (3)     Whether each individual employee actually took a second meal break; and

2        (4)     In the event the employee failed to take a second meal break, the reasons why the

3    break was not taken.

4    Under these circumstances, it is clear that individual issues predominate in this case, and

5    Plaintiffs simply cannot maintain their meal period claims as a class action.

6           Plaintiffs also contend that Conam had a uniform policy that required its employees to

7    work more than ten hours without paying them overtime for the ninth and tenth hours. Plaintiffs'

8    overtime allegations are not amenable to class treatment because individual issues predominate as

9    to these claims as well. A class-wide determination of whether Conam failed to pay overtime to

10   its employees for their 9th and 10th hours of work would be virtually impossible. The manner in

11   which Conam employees are paid is dictated by a multitude of different factors, including, the

12   refinery to which he or she is assigned, whether he or she is working what is known as a

13   "turnaround," whether he or she is a "call out" employee (i.e., assigned to different locations as

14   needed, on a day-by-day basis), whether he or she is a permanent full-time employee, and finally,

15   whether the employee works in Northern versus Southern California. For each employee, these

16   factors vary significantly from worksite-to-worksite and in some cases, from day-to-day.

17   Contrary to Plaintiffs' position, Conam did not and does not have a **uniform** pay practice that

18   applies to the members of the alleged putative class. As such, a class-wide analysis of Plaintiffs'

19   overtime claims would involve hundreds of individual inquiries regarding each employee's

20   schedule, actual hours worked, employment status, and worksite.

21          The ultimate issue in this case – Conam's liability, if any – requires an individualized

22   inquiry into a complex set of facts and circumstances. It is clear that individual issues

23   predominate and there is no commonality among the class. As a result, class treatment would not

24   be amenable and is not a superior method of adjudicating the claims of the Plaintiffs' purported

25   class and sub-class. Furthermore, proceeding as a class action under these facts would

26   undercompensate some employees that may have a true injury (those employees who were

27   allegedly not properly paid for overtime and/or were not provided a second meal period) while

28   overcompensating other employees who had no injury (those employees who were paid overtime

1   and were provided a second meal break). Lastly, Plaintiffs' sub-class is vague and suffers from

2   the same defects as the class.  For all the foregoing reasons, Plaintiffs' motion for class

3   certification must be denied.

4   **II.     FACTUAL BACKGROUND**

5       **A.     Conam Performs Work At Numerous Worksites Throughout the State of**

6           **California.**

7           Conam provides on-site "nondestructive testing," inspection, and quality assurance and

8   quality control services for a number of facilities throughout California and worldwide, including

9   oil refineries, petrochemical plants, chemical facilities, and power plants.  (Declaration of Dennis

10  Bertolotti ("Bertolotti Decl."), at ¶ 3.)  Conam employs inspectors, testing technicians, and testing

11  assistants who work on-site at facilities that are owned and operated by Conam's customers.

12  (Bertolotti Decl., at ¶ 4.)  The work performed by Conam employees varies from worksite-to-

13  worksite, and can include services such as ultrasonic testing, radiography, magnetic particle

14  testing, liquid penetrate testing, positive materials identification, and visual inspections.  (*Id.*)

15  Conam's customers rely on Conam's testing technicians and inspectors, whose services are

16  integrated into each facility's overall efforts to increase plant safety, minimize unscheduled

17  downtime, and to allow for planning repair and replacement of critical components and systems.

18  (*Id.*)

19          Depending on the nature of the service contracts, Conam provides testing and inspection

20  services on an ongoing basis, or on a temporary, episodic "call-out" basis.  (Bertolotti Decl., at ¶

21  5.)  In California, Conam coordinates its workforce from administrative offices in Signal Hill and

22  Benicia.  (Bertolotti Decl., at ¶ 6.)  Currently, Conam provides services at customer facilities on

23  an ongoing basis at five refineries in Southern California, including a British Petroleum Refinery

24  in Carson ("BP Carson"), an Exxon-Mobil Refinery in Torrance, a Valero Refinery in

25  Wilmington, a Conoco-Phillips Refinery in Wilmington, and an INEOS chemical facility in

26  Carson.  (*Id.*)  Conam also regularly provides services to four refineries in Northern California,

27  including a Shell Refinery in Martinez ("Shell Martinez"), a Valero Refinery in Benicia, a

28  Conoco-Phillips Refinery in Rodeo, and a Dow Chemical Refinery in Pittsburg.  (*Id.*)

### 1. Ongoing Contracts.

The number of Conam employees permanently assigned to the above refineries ranges from 1 to 60. (Bertolotti Decl., at ¶ 7.) The number of employees permanently assigned to a particular refinery does not change significantly from year to year. (*Id.*) For example, in 2000, Conam had approximately 40 testing and inspection employees assigned to BP Carson. Today, that number is somewhere between 50 and 60. (*Id.*) The number of employees assigned to a particular worksite is governed by the customer's needs. (Bertolotti Decl., at ¶ 8.) This need, and accordingly, the number of employees assigned to a particular refinery, can increase dramatically during what is known as a "turnaround," which is when a refinery is shut down entirely for maintenance and repair. (*Id.*) In some instances, the total number of employees working at a particular refinery can double in size during a "turnaround." (*Id.*) The number of "turnarounds" in any given year varies from worksite-to-worksite, averaging one to two "turnarounds" per year. (*Id.*) "Turnarounds" generally last two to three weeks, but can, on occasion, run as long as eight weeks. (*Id.*) Once a "turnaround" ends, the number of employees assigned to the worksite is reduced to its pre-"turnaround" amount. (*Id.*)

### 2. Temporary or "Episodic" Contracts.

In addition to the nine refineries listed above, Conam employs testing and inspection employees on a "call-out" basis at other facilities on an as needed basis. (Bertolotti Decl., at ¶ 9.) "Call-out" employees are not assigned to a particular worksite, but instead, perform testing and inspection services on an episodic basis at different worksites throughout California, such as power plants, pipeline projects, offshore oil platforms, chemical facilities, boiler plants, refineries, and tank facilities. (*Id.*) Conam does not maintain on-going service contracts with its "call-out" customers, and instead provides testing and inspection services to these worksites as requested. (*Id.*) Thus, the number, type, and location of Conam's "call-out" worksites in California can and does change significantly from year-to-year. (*Id.*)

**B.**     **Conam Employs A Divergent Workforce And Employee Schedules Depend Upon The Worksite To Which Each Employee Is Assigned And Their Individual Employment Status.**

Conam testing and inspection employees may work in several different positions throughout their tenure with the Company.  (Bertolotti Decl., at ¶ 10.)   Typically, Conam employees are hired as Testing Assistants, which assist designated Testing Technicians.  (*Id.*)  If a Testing Assistant demonstrates potential and obtains requisite testing and inspection certifications, he or she may be promoted to a Testing Technician.  (*Id.*)  Most employees spend their entire careers as Testing Technicians.  (*Id.*)  In some instances, Testing Technicians are promoted into supervisory roles with the Company.  (*Id.*)  Supervisors are in charge of overseeing other Testing Assistants and Testing Technicians, in addition to continuing to perform limited testing and inspection services themselves.  (*Id.*)  In any one of these positions, employees can and do work for Conam in a number of separate and distinct capacities.  (Bertolotti Decl., at ¶ 11.)

### 1.     Employees Permanently Assigned To A Refinery.

First, a testing and inspection employee may be assigned to a single refinery for his or her entire career, or to more than one refinery during that tenure, on a full-time basis.  (*Id.*)  In this instance, employees work according to the schedule dictated by Conam's customers.  (*Id.*)  For example, employees assigned to BP Carson work a 4/10 schedule, employees assigned to Shell Martinez work a 9/80 schedule, whereas, employees assigned to Conoco-Phillips work a 5/8 schedule.  (Declaration of Wendy Myers ("Myers Decl."), at ¶ 3; Declaration of Mike Price ("Price Decl."), at ¶ 3.)  If an employee working a 4/10 schedule at BP Carson is then reassigned to Conoco-Phillips, the employee's schedule would be changed from a 4/10 to a 5/8.  (Myers Decl., at ¶ 3.)  Conam employees assigned to these refineries report each day to a Conam "lead supervisor" assigned to the particular facility and/or an owner representative to obtain their work assignments. (Bertolotti Decl., at ¶ 11.)

### 2.    Call-Out Employees.

Second, a testing and inspection employee may be hired as a "call-out" employee. (Bertolotti Decl., at ¶ 12.) As a general practice, "call-out" employees are not assigned to any particular facility or customer. (*Id.*) Instead, "call-out" employees are *temporarily* assigned to particular worksites. (*Id.*) Before a "call-out" employee begins his or her day, a Conam field supervisor from either the Signal Hill or Benicia offices contacts the employee with a work assignment. (*Id.*) Work assignments vary from day-to-day and from worksite-to-worksite. (*Id.*) Ordinarily, "call-out" employees are assigned to one worksite a day. (*Id.*) On some days, depending on the length of time it takes the employee to finish a particular work assignment, an employee may be called out to more than one worksite. (*Id.*)

Throughout the class period, Conam has employed an average of 18 "call-out" employees in Southern California and 30 "call-out" employees in Northern California. (Myers Decl., at ¶ 4; Price Decl., at ¶ 4.) The number of "call-out" employees employed by Conam fluctuates based upon customer demand. (Bertolotti Decl., at ¶ 13.) During a "turnaround" or when customer demand is high, the number of "call-out" employees increases significantly. (*Id.*) At other times, when customer demand is lower, "call-out" employees may not receive work assignments at all, and may be removed from Conam's payroll. (*Id.*) When business picks up again, Conam hires "call-out" employees back on a temporary or permanent basis depending on customer demands. (*Id.*)

### 3.    Temporary Employees.

Third, Conam employs a number of employees on a purely temporary basis. (Bertolotti Decl., at ¶ 14.) During a "turnaround," for example, the number of testing and inspection employees required by a Conam customer increases significantly. (*Id.*) When this occurs, Conam may bring in Conam employees that travel from worksite-to-worksite exclusively working "turnarounds," or hire employees through a temporary employment agency.[1] (*Id.*)

---

[1] During a "turnaround," Conam might also bring in Conam employees permanently assigned to another California refinery who volunteer to work the "turnaround" on their scheduled days off and/or bring in "call-out" employees from its Signal Hill and Benicia offices. The number of employees Conam will bring into a refinery to do "turnaround" work depends on the number of employees already assigned to the

Conam employees that travel from worksite-to-worksite for "turnarounds" are often called "turnaround" employees. (*Id.*) Employees hired on a temporary basis through an employment agency are also called "turnaround" employees or "contract" employees. (*Id.*)

Within these broad categories, Conam employees can and do frequently move in and out of different and distinct job positions. (Bertolotti Decl., at ¶ 16.) For example, a testing and inspection employee may start with Conam as a "call-out" employee and later move into a permanent position at a particular refinery, or vice versa. (*Id.*) In addition, at the end of a "turnaround," Conam may hire a "contract" employee as a "call-out" employee or as a full-time employee assigned to a particular worksite. (*Id.*)

### C.    Conam's Payroll Practices Vary From Worksite-to-Worksite And From Employee-to-Employee.

The manner in which Conam's testing and inspection employees are paid varies from worksite-to-worksite and, depends on whether or not the employee is working as a "call-out" employee. (Bertolotti Decl., at ¶ 17.)

### 1.    Employees Permanently Assigned To A Refinery.

Employees permanently assigned to a refinery are paid according to the work schedule in place at the particular worksite. (Myers Decl., at ¶ 3; Price Decl., at ¶ 3.) For example, employees assigned to BP Carson are paid pursuant to a 4/10 schedule, employees assigned to Shell Martinez are paid pursuant to a 9/80 schedule, and employees assigned to Conoco-Phillips are paid based on a 5/8 schedule. (*Id.*) In Southern California, Conam employees assigned to a particular refinery continue to be paid according to their regular schedule, even when their hours temporarily increase during a "turnaround." (Myers Decl., at ¶ 3.) On the other hand, in Northern California, Conam employees assigned to a particular refinery are paid pursuant to a 5/8 schedule during "turnarounds." (Price Decl., at ¶ 3.) Therefore, during "turnarounds," Conam

---

bring into a refinery to do "turnaround" work depends on the number of employees already assigned to the facility on a full-time basis, the length of the "turnaround," and whether Conam's customers prefer to outsource "turnaround" work to other testing and inspection companies. (Bertolotti Decl., at ¶ 15.)

DOCUMENT PREPARED
ON RECYCLED PAPER

1  employees are paid overtime for every hour that they work more than eight hours in a day and

2  more than forty hours in a week. (*Id.*)

3  ### 2.  Call-Out Employees.

4  By contrast, "call-out" employees are almost always paid based upon a 5/8 workweek.

5  (Myers Decl., at ¶ 5; Price Decl., at ¶ 4.)  This pay practice does not vary from worksite-to-

6  worksite and does not change when a "call-out" employee is temporarily assigned to work a

7  "turnaround." (*Id.*)  Although "call-out" employees ordinarily adopt the work schedule in effect

8  at a particular worksite to which they are temporarily assigned, including a "turnaround"

9  schedule, "call-out" employees are still paid according to their ordinary 5/8 schedule. (*Id.*)

10  "Call-out" employees working out of Conam's Benicia office have been paid pursuant to a

11  5/8 schedule throughout the class period. (Price Decl., at ¶ 4.)  The only time that a "call-out"

12  employee's method of payment changes is when that employee is assigned to a particular refinery

13  for a long-term assignment. (*Id.*)  The "call-out" employee may then be paid according to the

14  schedule in place at the refinery during the long-term assignment. (*Id.*)

15  Conam's payroll practices for "call-out" employees working out of Conam's Signal Hill

16  office have varied throughout the class period.  Up until approximately a year and a half ago,

17  "call-out" employees were paid according to how they began their workweek. (Myers Decl., at ¶

18  4.)  For example, if an employee was called out to work at BP Carson on Monday, Tuesday, and

19  Wednesday of a given week and then called out to work at a power plant on Friday, the employee

20  would be paid according to the 4/10 schedule used at BP Carson for the entire week. (*Id.*)  If, on

21  the other hand, the employee started his week at the power plant on Monday, and worked at BP

22  Carson from Tuesday until Thursday, the "call-out" employee would be paid pursuant to a 5/8

23  schedule for that week. (*Id.*)  This pay practice has since changed and all "call-out" employees

24  working out of Conam's Signal Hill office are paid based on a 5/8 schedule regardless of how

25  they start the workweek. (*Id.*)

26

27

28

DOCUMENT PREPARED
ON RECYCLED PAPER

1          3.      **Temporary Employees.**

2          "Turnaround" and "contract" employees have been paid pursuant to a 5/8 schedule

3   throughout the class period.[2]  (Myers Decl., at ¶ 6; Price Decl., at ¶ 5.)

4                  4.      **Conam    Has    Conducted    Alternative    Workweek**

5                          **Elections.**

6          Over the years, Conam has conducted a number of alternative workweek elections to

7   adopt or affirm the schedules in effect at its California facilities.  In or around 1998, Conam

8   employees assigned to BP Carson conducted an alternative workweek election, which resulted in

9   a unanimous vote for a 4/10 schedule.  (Declaration of Thomas Schindler, at ¶ 3.)  In or around

10  February of 2000, Conam employees assigned to Shell Martinez also conducted an alternative

11  workweek election, which resulted in a two-thirds majority vote for a 9/80 schedule.  (Price Decl.,

12  at ¶ 6.)  In June of 2008, Conam conducted seven additional alternative workweek elections at

13  refineries across California to affirm the schedules adopted at those worksites.  (Declaration of

14  Diane Morelli ("Morelli Decl."), at ¶ 3.)  At all seven facilities, the alternative workweek

15  schedules were affirmed by at least a two-thirds majority and at four worksites, the schedules

16  were unanimously affirmed.  (*Id.*)  The results of these recent elections were appropriately

17  reported to the Department of Labor Statistics and Research.  (*Id.*)

18         Based on the aforementioned facts, it is clear that whether or not a particular employee

19  was properly paid overtime depends on many separate and distinct factors that preclude class

20  certification.  Those factors include the following:

21         •   The employee's payment schedule (whether he was paid pursuant to a 4/10, 9/80

22             or 5/8 schedule);

23         •   The employee's employment status (permanently assigned to a refinery, "call-out"

24             employee, or temporary employee);

25

26  [2] "Turnaround" and "contract" employees are sometimes assigned to work an alternative workweek
    schedule.  Although these employees adopt the alternative workweek schedule, they are still paid pursuant
27  to a 5/8 schedule.  Plaintiffs submitted a number of employee declarations from "contract-based"
    employees who declared that they never voted in an alternative workweek election.  As these employees
28  were paid pursuant to a 5/8 schedule, they were not eligible to vote in alternative workweek elections held
    by Conam.  (*See e.g.*, Declaration of Anthony J. Corrado, ¶ 6; Declaration of Christopher W. Cutler, ¶ 6.)

OPPOSITION TO CLASS CERTIFICATION    - 9 -
MOTION Case No. C-07-4956-SI

- Whether or not an alternative workweek schedule was in place at the particular refinery;

- The worksite (whether the refinery worked a 4/10, 9/80 or 5/8 schedule);

- Length of the work assignment (whether a "call-out" employee in Northern California was working on a long-term assignment);

- Timing within the class period (whether the overtime was incurred before or after the change in payroll practices at the Signal Hill office for "call-out" employees);

- What type of work was being performed (was the employee working a "turnaround" in Northern California, and thus, being paid based on a 5/8 schedule).

Given these variant factors, it is impossible to make a class-wide determination as to overtime compensation claims. A proper assessment of overtime compensation requires an individualized determination of all of the foregoing factors.

### D.    Conam's Meal Period Policy Complies With California Law.

Plaintiffs assert in their Motion that Conam had a policy against second meal periods. The facts demonstrate otherwise. All Conam employees receive an Employee Handbook upon commencing employment and updated versions thereafter. (Bertolotti Decl., at ¶ 18; Myers Decl., at ¶ 7; Price Decl., at ¶ 7.) Since 2003, Conam has issued two employee handbooks. (*Id.*) Both employee handbooks have identical policies concerning meal breaks, which read as follows:

> You are encouraged to take a lunch break. However, to ensure that workflow is not disrupted in your area, lunch breaks should be scheduled with your supervisor. Lunch is not considered time worked. Additional breaks may be scheduled at the discretion of your supervisor and in accordance with the **applicable state laws**. (*Id.*) (Emphasis added).

By the very nature of their schedules, Conam testing and inspection employees, even those assigned to an alternative workweek schedule, ordinarily do not work more than ten hours in a single day. (Myers Decl., at ¶ 8; Price Decl., at ¶ 8.) Accordingly, most Conam employees are entitled to and are provided with only one meal break a day. Sometimes, however, during a "turnaround" or for special projects and emergencies, employees work more than the hours

1  dictated by their ordinary schedule. *(Id.)* During the times that employees worked more than ten

2  hours, they were not precluded from taking an additional meal. *(Id.)* Conam does not have a

3  policy that discourages or prevents its employees from taking a second meal break. *(See*

4  Declaration of Laine Blanchard, at ¶ 4; Declaration of Renato Echevarria, at ¶ 4; Declaration of

5  Rick Surber, at ¶ 4; Declaration of Jackson Smith, at ¶ 5.)  In fact, as evidenced by the

6  declarations attached to this opposition, Conam employees were encouraged to take, and did take

7  second meal breaks. *(Id.)* Sometimes, Conam employees voluntarily chose to work through their

8  meal breaks so they could leave work early. (Price Decl., at ¶ 8.)  However, Conam employees

9  are not expected to or encouraged to work through their second meal break. (Myers Decl., at ¶ 8;

10  Price Decl., at ¶ 8.)  Conam employees do not clock in and out for their meal breaks.  (Myers

11  Decl., at ¶ 9; Price Decl., at ¶ 9.)

12  Given Conam's meal period policy, which explicitly provides for meal breaks, Conam's

13  liability for not providing meal breaks, if any, necessitates an individualized inquiry into **why** a

14  the meal break was not taken.   This individualized inquiry is entirely inappropriate for class

15  treatment.  Therefore, Plaintiffs Motion must be denied. *See Brinker*, 2008 Cal. App. LEXIS

16  1138, at *4.

17  **III.    LEGAL STANDARD**

18  Pursuant to Federal Rules of Civil Procedure ("FRCP") Rule 23, to certify a class,

19  Plaintiffs bear the burden of demonstrating that *all* of the prerequisites of Rules 23(a) **and** 23(b)

20  have been met. *Zinser v. Accufix Research Inst. Inc.,* 253 F.3d 1180, 1186, as amended, 273 F.3d

21  1266 (9th Cir. 2001).  Rule 23(a) provides four prerequisites for class certification: (1) the class

22  must be so numerous that joinder of all members is impracticable; (2) questions of law or fact

23  exist that are common to the class; (3) the claims or defenses of the named plaintiffs are typical of

24  the claims or defenses of the class; and (4) the named plaintiffs will fairly and adequately protect

25  the interests of the class. FED. R. CIV. P. 23(a).

26  In addition, Plaintiffs must *also* establish that one or more of the grounds for maintaining

27  the suit are met under Rule 23(b), including: (1) that there is a risk of substantial prejudice from

28  separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be

1  appropriate; or (3) that common questions of law or fact predominate and the class action is

2  superior to other available methods of adjudication. *See* FED. R. CIV. P. 23(b); *see also Valentino*

3  *v. Carter-Wallace, Inc.,* 97 F.3d 1227, 1229 (9th Cir. 1996). As set forth below, Plaintiffs have

4  failed to satisfy the requirements of Rules 23(a) and 23(b)[3] as to the purported class <u>and</u> sub-class.

5  Therefore, the motion for class certification must be denied.

6  **IV.    THE COURT SHOULD DENY CERTIFICATION BECAUSE INDIVIDUAL**

7  **INQUIRIES PREDOMINATE.**

8  Plaintiffs bear the burden of establishing that class certification is appropriate by showing

9  that common issues of fact or law predominate over issues that affect only individual class

10  members. *Zinser*, 253 F.3d at 1186. In order to determine whether common issues of law or fact

11  predominate, "the trial court must examine the issues framed by the pleadings and the law

12  applicable to the causes of action alleged." *Hicks v. Kaufman & Broad Home Corp.,* 89 Cal.

13  App.4th 908, 916 (2001). Courts are required to consider the nature and range of proof necessary

14  to establish the allegations. *Blackie v. Barrack,* 524 F.2d 891, 900-01 (9th Cir. 1975). Plaintiffs

15  have failed to properly examine the proof relevant to the substantive issues in this case. When a

16  proper analysis of the complex evidence and law is conducted, the analysis under FRCP 23(b)(3)

17  results in the inescapable conclusion that individual issues predominate. Accordingly, class

18  certification is inappropriate and Plaintiffs' motion should be denied.

19  **A.    Plaintiffs' Meal Period Claim Is Inappropriate For Class Certification**

20  **Because Individual Issues Necessarily Predominate.**

21  **1.    The *Brinker* Decision Forecloses Certification of**

22  **Plaintiffs' Meal Period Class.**

23  The law in California on the issue of meal breaks is clear – and fatal to Plaintiffs' motion

24  for class certification. In *Brinker,* the California Court of Appeal addressed the issue of whether

25  employees' meal period claims are amenable to class treatment given an employer's policy of

26

27

28  [3] Of the three elements set forth under Rule 23(b), Plaintiffs have only alleged satisfaction of Rule 23(b)(3).

DOCUMENT PREPARED
ON RECYCLED PAPER

1   providing for, but not ensuring, meal breaks. *Brinker*, 2008 Cal. App. LEXIS, at *4.[4]   The

2   *Brinker* court unequivocally determined that employees' meal period claims are <u>not</u> amenable to

3   class treatment when the employer's policy provides for meal breaks because in such a situation

4   individual issues as to why a meal break was not taken necessarily predominate. *Id.*

5        The reason for this holding is clear:

6            The reason meal breaks were not taken **can only be decided on a
             case-by-case basis**.  It would need to be determined as to each
7            employee whether a missed or shortened meal period was the result
             of an employer's personal choice, a manager's coercion or . . .
8            because . . . employees could not actually take permitted meal
             breaks. *Id.* at *68.
9

10  Thus, in the absence of a policy that fails to provide for meal breaks, *Brinker* **forecloses**

11  certification of employees' meal period claims.

12       Conam's written policy is lawful on its face, as it clearly provides for second meal breaks.

13  It reads: "Employees are encouraged to take meal breaks . . . "additional breaks [i.e., second

14  meal breaks] may be scheduled at the discretion of [the] supervisor and in accordance with

15  **applicable state laws**."[5]   (See Conam's Employee Handbooks, attached as Exhibit "A" to the

16  Declarations of Candace Bertoldi; Myers Decl., at ¶ 7; Price Decl., at ¶ 7).

17       Given Conam's lawful meal period policy, *Brinker* is clear – Plaintiffs' meal period

18  claims are <u>not</u> susceptible to class treatment.  Accordingly, the Court must deny certification.

19                      **2.      The Direct Evidence And Declarations Before The Court**

20                              **Compel The Conclusion That Conam's Policy Was**

21                              **Lawful; Therefore, Certification Should Be Denied.**

22       Plaintiffs attempt to distinguish this case from *Brinker* by arguing that Conam has a

23  statewide policy and practice of denying and discouraging second meal breaks.  The evidence

---

[4] Although the California Supreme Court has not offered its own interpretation of California's meal period
requirement, *Brinker* is a good indication of how the Court would rule on this issue and its holding should
be applied to this case. *See Wyler Summit P'Ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 663 (9th Cir.
1998) (absent California Supreme Court precedent, the federal courts must apply the rule it believes the
Court would adopt under the circumstances).
[5] The fact that Conam's written policy does not specifically mention a second meal period does not render
it susceptible to class treatment.  The policy explicitly provides for meal periods.

DOCUMENT PREPARED
ON RECYCLED PAPER

1   relied upon for this argument is unsupported, conclusory, and utterly refuted by Conam's written

2   policy providing for meal breaks. Furthermore, the state of the evidence requires that the Court

3   deny class certification.

4              a.       Plaintiffs' Evidence Is Incompetent, And Conclusory, And Fails To
                        Show That Certification Is Appropriate.
5

6          In order for Plaintiffs to succeed on their Motion, they must show that Conam's meal

7   period policy is unlawful – i.e., that unlike *Brinker*, it does not provide for meal periods.

8   Plaintiffs' evidence fails to make that showing.

9          The case of *Lanzarone v. Guardsmark Holdings, Inc.*, 2006 U.S. Dist. LEXIS 95785

10  (C.D. Cal. 2006), wherein the Court denied class certification after finding that a host of

11  individual issues predominated, is instructive. *Id.* at *13. In this case, the Court observed that

12  "[i]n an apparent attempt to suggest that some issues of liability can be addressed for all class

13  members at the same time," plaintiff made a blanket assertion that Guardsmark had a "practice

14  and policy of denying officers meal and rest periods . . . ." *Id.* at *11. The Court observed,

15  however, that the evidence presented by the parties did not support this blanket assertion. *Id.* at

16  **11-12. The Court explained that certification is inappropriate where the "direct evidence and

17  declarations submitted compel the conclusion that Guardsmark has no policy that violates the

18  law." *Id.* at *12. In that vein, the Court was unmoved by Plaintiffs' declarations that were

19  limited to only one branch and mostly at one account, and instead, looked at the entire record. *Id.*

20         Plaintiffs' testimony and declarations submitted to the Court are narrow in scope and fail

21  to support their conclusions. Both Plaintiffs have spent their entire Conam careers in Southern

22  California, and primarily at BP Carson. (Deposition of Steven Taylor ("Taylor Depo."), 40:11-

23  41:9, 42:8-11; Deposition of Gerald Lee ("Lee Depo."), 13:13-16:4.) Steven Taylor only ever

24  worked at the BP Refinery in Carson, the BP facility in Paramount, the pipeline facility in

25  Manhattan Beach and the AES power plant in Long Beach. (Taylor Depo., 40:11-41:9, 42:8-11.)

26  Gerald Lee also worked in Southern California, and only once ever traveled to Northern

27  California to work at a boiler facility on a "call-out," for a two week period. (Lee Depo., 30:7-

28  25.) Plaintiffs admit that they have no idea what the meal break practices were or are at Conam

1     facilities, of which they did not work. (Taylor Depo., 69:15-18; Lee Depo., 49:1-5.) Likewise,

2     the knowledge of Plaintiffs' declarants is exclusively limited to Southern California, with all but

3     seven principally working for BP Carson.[6]  Notably absent from Plaintiffs' evidence is any

4     declarations from Conam employees working in Northern California.

5           The limited scope of Plaintiffs' evidence fails to demonstrate a statewide policy and

6     practice of denying meal periods.  As such, Plaintiffs fail to show that Conam's policy is

7     unlawful.

8              b.    <u>Conam's Declarations Clearly Demonstrate That The Meal Period</u>
<u>Policy Was And Is Lawful.</u>

9

10           By contrast, Conam has submitted <u>21</u> declarations from employees working throughout

11     the state of California that describe Conam's meal period policy.  In virtually all of these

12     declarations, employees declare that no one from Conam ever discouraged or prevented them

13     from taking a second meal break.  Also, no one from Conam ever told these employees that they

14     were not allowed to take a second meal break.  In fact, Conam employees declared that they took

15     second meal breaks.  (*See* Declaration of Laine Blanchard, at ¶ 4; Declaration of Renato

16     Echevarria, at ¶ 4; Declaration of Rick Surber, at ¶ 4; Declaration of Jackson Smith, at ¶ 5.)  At

17     other times, Conam employees voluntarily chose to work through their meal breaks so they could

18     leave work early.  (Price Decl., at ¶ 8.)  As a matter of policy, however, Conam employees are

19     **not** and were not expected or encouraged to work through their second meal break.  (Myers Decl.,
at ¶ 8; Price Decl., at ¶ 8.)

20

21           The direct evidence submitted by Conam compels the conclusion that its policy does not

22     violate the law.  On that basis alone, class certification is inappropriate.

---

[6] In addition, at least one of Plaintiffs' declarants testified inaccurately. Oscar Vivanco testified that he was never paid overtime for the ninth and tenth hours that he worked at Conam. Mr. Vivanco's timesheets show the contrary. (*See* sample timesheets attached as Exhibit "D.") Also, the declaration of Marisol Camargo should be dismissed in its entirety because she admits that she is an administrator for Conam. Thus, she is not a member of the proposed class or sub-class.

1           **3.**      **Any Alleged Meal Period Violations Raise**

2                   **Individualized Issues Of Fact That Cannot Be**

3                   **Determined On A Class-Wide Basis; Therefore,**

4                   **Certification Must Be Denied.**

5       Contrary to Plaintiffs' assertions, the alleged meal period violations are not susceptible to

6 class treatment because individual issues predominate. Conam's meal period policy was and is

7 lawful. Thus, to the extent an employee was not provided a second meal period, "the reason the

8 meal break was not taken **can only be decided on a case-by-case basis**." *Brinker*, 2008 Cal.

9 LEXIS, at *4 (emphasis added). Moreover, Plaintiffs' evidence fails to demonstrate that common

10 issues of fact predominate; Plaintiffs have not met their burden. Together with Conam's

11 evidence, it merely indicates that some employees took second meal periods and others did not.

12 For these reasons, any determination as to Conam's liability in this case raises individual issues of

13 fact that require an individualized inquiry as to each employee and the unique circumstances of

14 their shift, schedule, and worksite.

15             a.      <u>Plaintiffs' Evidence Fails To Demonstrate Common Issues.</u>

16       Plaintiffs reliance on Conam's timesheets is misguided and does not render the second

17 meal period claim one in which common issues predominate. In a recent case, *Brown, et al. v.*

18 *Fed. Express Corp.*, 249 F.R.D. 580 (C.D. Cal. 2008), the court held that the use of timesheets

19 was not a viable method of proving meal break claims on a class-wide basis as they could not

20 provide the "reason for [the] missed breaks." *Id.* at 587. The fact that Conam employees do not

21 record their meal breaks on their timesheets does not equate to a failure by Conam to provide a

22 meal period. It is undisputed that Conam employees do not clock in and out for meal breaks. For

23 these reasons, the timesheets simply cannot establish that Conam had a policy and practice of

24 denying second meal periods.

25       Even if the time cards showed that meal breaks were not taken, they could not show *why*.

26 Determination as to why an employee did not take a second meal period requires an

27 individualized inquiry. For example, in *Blackwell v. Skywest Airlines*, 245 F.R.D. 453, 468 (S.D.

28 Cal 2007), the Court denied certification due, in part, to the fact that employees waived breaks

1  (some were oral while others were in writing) and sometimes had downtime sufficient to qualify

2  as required breaks, making individual inquiries necessary. The defendant's list of individualized

3  questions undermined the Plaintiffs' blanket assertions of predominancy. *Id.* at 469.

4       Plaintiffs' timesheets argument fails to demonstrate that *common* issues predominate.

5  Plaintiffs cannot escape the fact that *individual* issues predominate given Conam's lawful meal

6  period policy.

7                  b.    <u>Individual Issues Of Fact Predominate.</u>

8       Moreover, the unique and divergent circumstances of each Conam employees' schedule,

9  shift, and worksite, and employment status, further demonstrate the <u>fact</u> that individual issues of

10  <u>fact</u> predominate. For example, an employee working an alternative workweek schedule, by the

11  very nature of that schedule, does not work more than ten hours in a day. Likewise, "call-out"

12  employees ordinarily do not work more than ten hours in a day. On these days, Conam

13  employees are not entitled to a second meal break. On other days, employees may work more

14  than ten hours due to a "turnaround," special project, or emergency, and would be entitled to a

15  second meal break. On some days, employees have downtime in which they can take a second

16  meal break. On other days, employees voluntarily choose to work through their second meal

17  break in order to go home early. Therefore, in ascertaining liability, the Court will need to look at

18  whether an employee was even entitled to a second meal break.

19       In sum, to determine if and why an employee missed a second meal break, the Court must

20  inquire as to the following factors: (1) whether the employee worked more than ten hours

21  entitling them to a second meal period; (2) whether the employee was provided the opportunity to

22  take a second meal period; (3) whether the employee actually took his second meal period; (4)

23  why the employee failed to take his second meal period; (5) whether the employee voluntarily

24  declined to take the second meal period; and (6) whether the employee was paid for the missed

25  meal period. Because these factual circumstances varied from employee-to-employee, worksite-

26  to-worksite, and, in some cases, day-to-day, no common issues of fact exist.

27       The individualized circumstances surrounding whether an employee was entitled to a

28  second meal period and why the employee chose to take or not take a break on that particular day

DOCUMENT PREPARED
ON RECYCLED PAPER

cannot be determined in a "one size fits all" class litigation.  If somewhere within Conam there was a second meal period violation, it was individualized and should be adjudicated as such.  Therefore, Plaintiffs' meal period claim is not amenable to certification.  Because Plaintiffs' proposed class and subclass are not separated by meal period and overtime claims, the failure to certify Plaintiffs' meal period claim is fatal to their overtime claim as well.

**B.    Plaintiffs' Overtime Claim Is Inappropriate For Class Certification Because Individual Issues Necessarily Predominate.**

Despite the fact that Plaintiffs' failure to certify the meal period claim precludes certification altogether, a class-wide determination of Conam's overtime liability would be impossible.  In an attempt to subject their claims to common proof, Plaintiffs conveniently narrow the inquiry to one simple issue – whether Conam validly implemented alternative workweek schedules for the employees assigned to particular locations.  This inquiry, however, is only the first step.  The Court must also determine whether employees are actually owed overtime compensation - an issue Plaintiffs blatantly ignore.  This determination inherently requires an individualized analysis of the facts and circumstances surrounding each employees' employment and is not subject to common proof.

**1.    Whether Employee Were Properly Paid Overtime Involves Significant Individualized Factors That Cannot Be Determined On A Class-Wide Basis.**

This issue was addressed in the *Jimenez* case, wherein the court denied certification because the determination of which employees were entitled to overtime required an "individual, fact-specific analysis" not amendable to class treatment.  *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 251 (C.D. Cal. 206).  In *Jimenez*, whether a manager employee was entitled to overtime, based on a misclassification theory, depended on various factors that differed from person-to-person and day-to-day.  Because each manager's experience and time spent on the various tasks differed and the questions and issues of proof were so individualized, the Court could not conclude that common questions predominated.  *Id.* at 251, 252.  The Court also agreed that proceeding as a class action, given the number of individual inquiries, would be

DOCUMENT PREPARED
ON RECYCLED PAPER

1   "unmanageable." *Id.* at 253. Based on these differences, and because "Domino's has a right to

2   cross examine each general manager to determine whether there is liability as to that specific

3   person," the court properly denied certification. *Id.*

4        Plaintiffs' overtime claim involves the same complex individual issues of proof raised in

5   *Jiminez.* As Conam's evidence clearly demonstrates, the manner in which employees are paid is

6   dictated by a multitude of factors, including the employee's worksite(s), employment status, work

7   assignment, and the payroll practice he or she falls under.

8        To determine whether an employee is entitled to overtime, the Court must consider the

9   following issues: (1) employee's payment schedule (whether he is paid pursuant to a 4/10, 9/80 or

10  5/8 schedule); (2) the employee's employment status (permanently assigned to a refinery, "call-

11  out" employee or temporary employee); (3) the worksite (whether the refinery abides by a 4/10,

12  9/80 or 5/8 schedule); (4) length of the assignment (whether a "call-out" employee in Northern

13  California is working on a long-term assignment); and (5) the manner in which the employee was

14  paid (whether as a "call-out" employee temporarily assigned to a 9/80 schedule at Shell Martinez

15  was paid according to a 5/8 schedule or whether a "temporary" employee working a "turnaround"

16  was in fact paid based on a 5/8 schedule); (6) timing within the class period (was the overtime

17  incurred before or after the shift in payroll practices at the Signal Hill office for "call-out"

18  employees); and (7) what type of work was being performed (was the employee working a

19  "turnaround" in Northern California and was, thus, being paid according to a 5/8 schedule).

20       Given the unique and divergent circumstances of Conam employees' employment, these

21  are just some of the individualized issues that will require mini-trials to establish an employee's

22  right to recover from Conam. These determinations cannot be made on a class-wide basis.

23       **2.    Conam's    Varied    Payroll    Practices    Preclude**

24  **Determination Of Overtime Liability By Class Action.**

25       Plaintiffs base their conclusory assertion that common issues of proof exist on a false

26  premise. They assert that Conam has a uniform pay practice, which is entirely false and

27  contradicted by the overwhelming evidence Conam has submitted. For example, up until

28  approximately a year and a half ago, "call-out" employees were paid according to how they began

their workweek. (Myers Decl., at ¶ 4.) Thus, if an employee was called out to work at BP Carson on Monday, Tuesday, and Wednesday of a given week and then called out to work at a power plant on Friday, the employee would be paid according to the 4/10 schedule used at BP Carson for the entire week. (*Id.*) If, on the other hand, the employee started his week at the power plant on Monday, and worked at BP Carson from Tuesday until Thursday, the "call-out" employee would be paid pursuant to a 5/8 schedule for that week. (*Id.*) This pay practice has since changed and all "call-out" employees working out of Conam's Signal Hill office are paid based on a 5/8 schedule regardless of how they start the workweek. (*Id.*) "Turnaround" employees are also paid pursuant to a 5/8 schedule even though they may adopt the alternative workweek schedule at a particular worksite. These are only a couple examples of Conam's various payroll practices in effect during the class period.

Furthermore, Plaintiffs supposition is unsupported by their own testimony and evidence. In fact, Plaintiffs have **no** evidence of Conam's alleged uniform payroll policy. Plaintiff Gerald Lee admitted that he has never reviewed the payroll records of any other employee. (Lee Depo. at ¶ 49:22-24.) Plaintiff Steven Taylor admitted that he did not know whether Conam's pay practices varied from worksite-to-worksite. (Taylor Depo. at 69:8-12.) Lee further testified that he had no knowledge of Conam's pay practices with regard to employees that worked at Martinez or out of the Benicia office in Northern California. (Lee Depo. at 49:17-21).

Because Conam's payroll practice varied throughout the class period, and there are a significant number of other factors that dictated how an employee was paid overtime, Plaintiffs' simply cannot show their overtime claim is subject to common proof. Therefore, Plaintiffs have failed to carry its burden under FRCP 23(b)(3) and the Court must deny certification.

## V.     <u>CERTIFICATION SHOULD BE DENIED BECAUSE A CLASS ACTION WOULD NOT BE A SUPERIOR METHOD OF ADJUDICATING THIS CONTROVERSY</u>.

In addition to establishing a predominance of common issues of fact or law, Plaintiffs must also show that a class action is "superior" to other methods available for adjudicating the controversy. *See* FED. R. CIV. P 23(b)(3). This requirement requires consideration of the difficulties likely to be encountered in the management of the litigation as a class action,

DOCUMENT PREPARED
ON RECYCLED PAPER

1    including, especially, whether and how the case may be tried and whether plaintiffs have shown

2    that there are plausible class-wide methods of proof available to prove their claims. *Maddock v.*

3    *KB Homes*, 248 F.R.D. 229, 240 (C.D. Cal. 2007). Plaintiffs have not, and cannot, satisfy this

4    burden.

5    **A.      The Superiority Requirement Fails As Adequate Alternatives Exist.**

6    Here, class treatment is not a superior method for adjudicating the claims at issue because

7    of the individualized nature of the meal period and overtime claims. Putative class members have

8    a number of options available, including various complaint processes, as well as external

9    agencies. The Department of Labor Standards and Enforcement ("DLSE") has an administrative

10   hearing option, called a Berman hearing. Such a hearing "is conducted 'in an informal setting

11   preserving the right(s) of the parties' and 'is designed to provide a speedy, informal, and

12   affordable method of resolving wage claims.'" *Lolley v. Campbell*, 28 Cal. 4th 367, 372 (2002).

13   A DLSE hearing "can be a quick procedure . . . and does present a viable alternative" despite

14   "disadvantages inherent" in the proceeding. *Jiminez*, 238 F.R.D. at 253-54.[7] Thus, affected

15   employees, who cannot be identified here without an individualized inquiry, need only file a

16   claim with the agency to seek compensation for a missed meal period or overtime. They do not

17   need the services of two separate law firms to do so.

18   **B.      Class Treatment of Plaintiffs' Class and Sub-Class Is Not A Superior Method**

19   **Of Adjudication.**

20   A class action is improper where an individual class member would be compelled to try

21   "numerous and substantial issues to establish his or her right to recover individually, after liability

22   to the class is established." *Maddock*, 248 F.R.D. at 49. Because individual issues predominate

23   in this case, it is clear that a class action would not be superior to other methods of adjudication.

24   Under these circumstances, a class action would be unmanageable and would deprive Conam of

25

26

27   [7] It should be noted that, in *Bell v. Farmers Ins. Exchange*, 115 Cal. App. 4th 715, 745-46 (2004), the court
disagreed that such a procedure was an adequate alternative under the facts of the case. The court noted
28   that the DLSE would be overloaded if it received 2000 individual claims. *Id.* Such a result is highly
unlikely here, as the proposed class is much smaller and the potentially affected individuals are even less.

1  the opportunity to investigate the circumstances behind an employee's missed meal break and

2  unpaid overtime.

3      Further, a class action proceeding under these facts would not adequately protect the

4  interests of the employees with actual injuries.  Instead, a class action would permit employees

5  who did not work more than ten hours in a day and/or were paid according to a 5/8 schedule to

6  recover when they, to the extent Conam is liable at all, suffered no actual injury.  At the same

7  time, those employees who are allegedly entitled to unpaid overtime and meal periods penalties

8  would recover less than they are entitled to.  This result is grossly unfair and inferior to the

9  potential recovery an injured employee could receive through alternate means of adjudication.

10  Accordingly, because a class action would be unmanageable and because there are viable

11  alternatives.  Plaintiffs fail to show that certification is proper under FRCP 23(b)(3).

12  **VI.    PLAINTIFFS' SUB-CLASS IS VAGUE, AMBIGUOUS, AND SUFFERS FROM**

13       **THE     SAME     DEFECTS     THAT     RENDER     PLAINTIFFS'     CLASS**

14       **UNCERTIFIABLE.**

15      Plaintiffs' sub-class definition is hopelessly vague and overbroad, fails to prove an

16  ascertainable class, and is overwhelmed by the same predominating individual issues of fact that

17  forecloses certification of Plaintiffs' purported class.  As it is defined, Plaintiffs' sub-class

18  includes all employees assigned to work at a particular location.  Because every Conam employee

19  is "assigned" to a particular location, whether it be on a full-time, call-out, or temporary basis,

20  Plaintiffs' sub-class definition potentially includes every Conam employee.  This interpretation

21  compels the conclusion that Plaintiffs' sub-class is identical to Plaintiffs' class, which cannot be

22  certified as set forth above.[8]

23      Another possible interpretation is that Plaintiffs' sub-class consists of employees working

24  alternative workweek schedules at a particular facility.  If this is what Plaintiffs intended, then the

25  sub-class also fails.  First, as Conam's evidence clearly demonstrates, many different types of

26  employees ("call-out", "turnaround," "temporary") can work an alternative workweek schedule

27

28  [8] Plaintiffs' class consists of all non-exempt, hourly testing and inspection employees employed by
    Conam in California since September 25, 2003.

DOCUMENT PREPARED
ON RECYCLED PAPER

1    when assigned to a particular work location, but still be paid according to a 5/8 schedule. A sub-

2    class of employees assigned to work alternative workweek schedules would therefore include

3    many employees who have suffered no injuries at all.

4        Second, proving liability under this sub-class definition is wholly dependent upon a host

5    of individualized factors, including employees' worksite, schedule, employment status. These

6    factors and Conam's payroll practices vary from employee-to-employee and from worksite-to-

7    worksite. Under such circumstances, certification of a sub-class consisting of all employees

8    working alternative workweek schedules at all Conam refineries would be still be impossible.

9    For the reasons, and those set forth in the preceding sections, Plaintiffs' sub-class cannot be

10    certified and Plaintiffs' Motion should be denied.

11    **VII.    CONCLUSION**

12        For all of the foregoing reasons, Plaintiffs' motion for class certification should be denied.

13    Plaintiffs have failed to satisfy all of the requirements set forth in FRCP Rules 23(a) and 23(b).

14    Specifically, Plaintiffs have not and cannot show that common issues of fact predominate or that

15    a class action is the superior method of adjudicating Taylor and Lee's claims.

16

17    DATED: August 15, 2008                    MARCUS A. TORRANO
                                                CANDACE S. BERTOLDI
18                                              FULBRIGHT & JAWORSKI L.L.P.
                                                By
19

20

21                                              Candace S. Bertoldi
                                                Attorneys for Defendant
22                                              CONAM INSPECTION AND
                                                ENGINEERING SERVICES, INC.

23

24

25

26

27

28