# EXHIBIT A

# CONAM I & ES

# EMPLOYEE MANUAL

Pltfs' EXHIBIT 9 (32 pg)
FOR IDENTIFICATION
WITNESS: _Bartleth_
DATE: _1/15/08_
DEBRA M. NAKANO PERRY
DEPOSITION OFFICER

CO 019347

9.1

## VII. TIME AND ATTENDANCE/RELATED PAY POLICIES

The nature of CONAM I & ES' business dictates that CONAM I & ES always remain open for business. Our clients expect CONAM I & ES to support them 24 hours a day, 7 days a week, 365 days a year. This is the nature of the work employees are expected to perform at CONAM I &ES. From time to time, employees are asked to report to work at various start times (morning, evening or night). In addition, employees are sometimes asked to work at various starting times on very short notice. On some occasions, employees are required to work overtime and, perhaps, to do so on short notice. CONAM I & ES understands the inconvenience of this to the personal lives of its employees and will try to minimize this inconvenience; however, it is a necessary part of our business.

### A. Work Schedules

Your work schedule is determined at the time you are hired and may change depending on your department's business needs. Your supervisor should review with you the department's scheduling needs periodically. Changes to the schedule may be made as necessary. Your supervisor should keep you informed of any schedule changes, including any overtime needs. Your understanding and cooperation in meeting work schedules in your department are important to maintaining a productive work environment.

> **Standard Work Week**
> Forty (40) hours per week shall constitute the standard workweek. Shifts shall be established, as business needs dictate. The workweek commences at 12:01 a.m. on Monday and extends through 12:00 midnight on the next Sunday. You will be notified if your location follows a different Standard Workweek than described above.

> **Exchanging Work Schedules**
> Exchanging work schedules with other employees is not allowed without prior authorization by the supervisor involved. If it is necessary to exchange schedules, notify your supervisor who may authorize the exchange if possible. Work schedule exchanges will not be approved for mere convenience or if the exchange will result in a disruption of or interference with normal operations or will result in excessive overtime.

### B. Breaks

Time away from your desk or workstation during each workday is important. You are encouraged to take a lunch break. However, to ensure that workflow is not disrupted in your area, lunch breaks should be scheduled with your supervisor. Lunch is not considered time worked. Additional breaks may be scheduled at the discretion of your supervisor and in accordance with applicable state laws.

### C. Overtime

Overtime is paid in accordance with all applicable federal and state laws. It may vary by state. It may also vary by customer preference only to the extent that it supercedes applicable laws.

### D. Call-in-Pay

If a non-exempt or hourly employee is called into work at the specific request of a supervisor, the employee shall be paid as required by state law.

### E. Reporting Time Worked

Every non-exempt (hourly) employee is responsible for completing a timecard or time sheet to report hours worked during each pay period. This time reporting form is a legal document. Each employee is authorized to report only his/her own hours and to sign only his/her own time reporting form. Altering or falsifying a time reporting form, including reporting hours for another employee, is cause for corrective action up to and including termination. Employees who work on a customer's premises, or as a contracted or sub-contracted employee, must have their time reporting forms signed by a customer representative.

14

CO 019360

9.14

### F. Payday

During a year, the company has 26 paydays, on alternate Fridays. If a regularly scheduled payday falls on a holiday, employees will be paid on the preceding workday.

Wages are paid by check or direct deposit. All legal, voluntary and involuntary deductions are shown on the check stub or voucher.

Your paycheck will not be delivered to anyone other than you or your supervisor unless you request in writing to your supervisor that the check be released to someone else. Picture identification may be required before the paycheck is released. If you are absent on payday, your check will be mailed to your home address unless you have made other arrangements in writing to your supervisor.

### G. Absenteeism and Tardiness

It is important that every employee report to work promptly at the time scheduled by their supervisor. Employees are expected to report to work as scheduled, on time and prepared to work. Employees are also expected to remain at work for their entire work schedule, except for meal periods, breaks or when you are required to leave on authorized Company business. Late arrivals, early departures or other absences from scheduled hours are disruptive and must be avoided.

When you know you are going to be late or absent, you must personally call your supervisor. Your absence or tardiness must be reported <u>directly to your supervisor</u> or other designated personnel, at least one hour prior to the start of your shift. If you call in less than one hour before the start of your shift, you will be considered tardy for that day. In all cases of absence or tardiness, employees must provide their supervisor with an honest reason or explanation.

Employees must also inform their supervisor of the expected duration of any absence. You must call in on any day you are scheduled to work and will not report to work. Unreported or unexcused absences may be documented by corrective action. Unreported or unexcused absences may be documented by corrective action up to and including termination of employment. See the Paid Time Off policy elsewhere in this Handbook for further information.

*If you fail to report to work without notifying your supervisor and your absence continues for a period of three days, the Company will consider you as having voluntarily resigned your employment.*

### H. Paid Time Off

CONAM I & ES recognizes the need for employees to have paid time off from work for rest and relaxation, and occasionally for the illness or injury of the employee or legal dependent of the employee.

Paid Time Off (PTO) provides you with paid time away from your job. You can use PTO for vacation days, sick days for you and your family, or for any personal or family matters that require you to take time off work. PTO is your time to manage and use as you feel appropriate.

Upon entering the regular full-time employment classification, an employee begins to earn PTO according to the accrual rate listed below. Before PTO can be used, the employee must complete 90 calendar days. After that time, the employee can request use of earned PTO including the time accrued during the waiting period.

PTO hours will be accrued on a per pay period basis for employees actively at work. Employees on short-term or long-term disability will not accrue PTO hours. All PTO must be used before any unpaid time off can be granted. At no time shall an employee have a negative balance in the PTO account, unless approved in advance by the President. Employees begin accruing at the higher accrual rate on the pay period that their anniversary date falls.

PTO hours will accrue on a per pay period basis at the rate shown on the table below:

| Years of Service | Accrued Rate | Earned in 12 months |
|---|---|---|
| Hire through 5 | 5.23 hours | 120 hours = 17 days |
| 6 through 15 | 6.77 hours | 160 hours = 22 days |
| 16 plus | 8.31 hours | 200 hours = 27 days |

15

CO 019361

9.15



# MISTRAS GROUP
## Services Division (Non-Union)

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## Employee Policy Manual

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

This manual specifically supersedes and replaces all previous employee manuals, manuals and policy statements, whether oral or written, or evidence in practice, issued by MISTRAS GROUP and its companies (CONAM I & ES and QSL Plus) effective August 1, 2006

**Recent Modifications**
Vacation Policy
Family and Medical Leave (FMLA)
Sick Leave
Short Term Disability

Exhibit __3__ (48ggs)
Previously Marked

CON0267

- Consistently late for work, whether it be for a field job or work in the lab or office. Punctuality is a major selling point in our business. In order for us to offer punctuality to our customers, we must insist on it from our employees.
- Intentional and improper use of radiation or radiation safety equipment, or other chemicals or equipment.
- NOT complying with the company and/or customer safety regulations.
- Neglecting job duties and responsibilities or refusing to take or perform a work assignment
- Failure to comply with the company's Fitness for Duty policy.
- Sexual, verbal or physical harassment of a co-worker, supervisor, or third party.
- Interfering with the performance of other employees or supervisors
- Engaging or participating in any unlawful interruption of work.
- Insubordination to a supervisor.
- Causing a substantial loss.
- Altering any time card or punching another employee's time card.
- Absences from work without appropriate notice or supervisor approval
- Bringing firearms, intoxicating beverages or illegal drugs on the premises.
- Possessing, selling or abusing or being under the influence of any illegal drug or controlled substance while at work or on work time.
- Defacing company property or property of our clients.
- Removing from company premises any company property, records or other materials without proper authorization.
- Violating any company policy, including the company no solicitation and distribution policy.
- Assaulting an employee, supervisor, or customer or other acts of violence.
- Gambling on company premises or while conducting company business.
- Use of company property of customer information for personal benefit.
- Physical and/or verbal threats or abuse directed at an employee, supervisor, or customer.
- Failing to immediately report an accident or damage to MHG customer property
- Providing any type of service or consultation in conflict or competition with the Company's interests.

This list of unprofessional conduct is not intended to be all-inclusive. MHG reserves the right to determine whether other conduct not listed above may warrant accelerated corrective action or immediate termination.

## VII.   TIME AND ATTENDANCE/RELATED PAY POLICIES

The nature of MISTRAS Holdings Group: Services Division' business dictates that we always remain open for business. Our clients expect MHG to support them 24 hours a day, 7 days a week, and 365 days a year. This is the nature of the work employees are expected to perform. From time to time, employees are asked to report to work at various start times (morning, evening or night). In addition, employees are sometimes asked to work at various starting times on very short notice. On some occasions, employees are required to work overtime and, perhaps on short notice. MHG understands the inconvenience of this to the personal lives of its employees and will try to minimize this inconvenience; however, it is a necessary part of our business

### A.  Work Schedules

Your work schedule is determined at the time you are hired and may change depending on your department's business needs. Changes to the schedule may be made as necessary. Your Supervisor should keep you informed of any schedule changes, including any overtime needs. Your understanding and cooperation in meeting work schedules in your department are important to maintaining a productive work environment.

#### Standard Work Week
Forty (40) hours per week constitutes the standard workweek. Shifts will be established, as business needs dictate. The workweek commences at 12:01 a.m. on Monday and extends through 12:00 midnight on the next Sunday. You will be notified if your location follows a different Standard Workweek than described above.

12

CON028E

**Exchanging Work Schedules**

Exchanging work schedules with other employees is not allowed without prior authorization by the supervisor involved. If it is necessary to exchange schedules, notify your Supervisor who may authorize the exchange. Work schedule exchanges will not be approved for mere convenience if the exchange will result in a disruption of or interference with normal operations or will result in excessive overtime.

**B. Breaks**

Time away from your desk or workstation during each workday is important. You are encouraged to take a lunch break. However, to ensure that workflow is not disrupted in your area, lunch breaks should be scheduled with your supervisor. Lunch is not considered time worked. Additional breaks may be scheduled at the discretion of your supervisor and in accordance with applicable state laws.

**C. Overtime**

Overtime compensation is paid to all nonexempt employees in accordance with federal and state wage and hour restrictions at the rate of 1-½ times straight pay. Overtime pay is based on actual hours worked. Overtime is paid for hours worked over 40 in the same work week according to Federal Law, unless State laws dictate otherwise. Time off from scheduled vacation leave, sick and/or holiday, jury duty and bereavement will not be considered hours worked for purposes of performing overtime calculations.

Double-time provisions are regulated by the State the employee works in and/or according to customer agreements.

Please note:  If an employee accepts a temporary position in another state or another office, that employee will be guided by all state and federal overtime rules by their work state or which ever overtime laws are employee favorable. Work state for purpose of definition is the state of where the employee's home office is located in.

**D. Reporting Time Worked**

Every non-exempt (hourly) employee is responsible for completing a timecard or time sheet to report hours worked during each pay period. This time reporting form is a legal document. Each employee is authorized to report only his/her own hours and to sign only his/her own time reporting form. Altering or falsifying a time reporting form, including reporting hours for another employee, is cause for corrective action up to and including termination. Employees, who work on a customer's premises or as a contracted or sub-contracted employee, must have their time reporting forms signed by a customer representative. All overtime must be submitted to the employee's home office no later than Monday at 3:00 PM ET of a pay week. If overtime is submitted late, overtime will be paid on the following pay period.

**E. Payday**

Payday is normally on every other Friday for services performed during the two (2) week period ending the previous Sunday at 12:00 midnight. If a scheduled holiday falls with a banking holiday, employees will be paid on the preceding workday. *For QSL Plus non-union employees, the pay day will change to a bi-weekly, paid on alternate Fridays starting in January, 2005.*

Wages are paid by check or direct deposit. All legal, voluntary and involuntary deductions are shown on the check stub or voucher.

Your paycheck will not be delivered to anyone other than you or your supervisor unless you request in writing to your supervisor that the check be released to someone else. Picture identification may be required before the paycheck is released. If you are absent on payday, your check will be mailed to your home address unless you have made other arrangements, in writing, to your supervisor.

13

CON0287

# EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GERALD LEE and STEVE TAYLOR,
individually and on behalf of
all others similarly situated,

      Plaintiffs,

    vs.                No. 3:07-CV-044956-SI

CONAM INSPECTION AND
ENGINEERING SERVICES, INC.,

    Defendant.          CERTIFIED
                     COPY

———————————————————————————

DEPOSITION OF GERALD LEE

Los Angeles, California

Thursday, June 12, 2008

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 89462B

GERALD LEE                                          06/12/08

1       Q   So that gave you technical ability to deal with

2   pressure vessels whereas you had not before and also to

3   deal with piping whereas you had not before?

4       A   Yes.

5       Q   How did that change your duties at CONAM then?

6       A   Well, a position became open at BP as a

7   mechanical inspector overseeing capital projects.

8       Q   And a capital project would be a new installation

9   of something?

10      A   Yes.

11      Q   When did that become open?

12      A   That became open in, for me, in 2003.

13      Q   So until 2003 your primary location was UltraMar,

14  but you might go out on other jobs to other locations, and

15  then in 2003, you took a job at CONAM, the BP location?

16          MR. TINDALL:   Objection; compound.

17          You can answer.

18          THE WITNESS:   Okay.   No.   From -- from 1997 I was

19  at BP as a CWI for two years, that project ended, and then

20  I was traveling again, and between '99 to 2003, in 2003 I

21  acquired that other position.

22  BY MR. TORRANO:

23      Q   Let me make sure I understand what you were doing

24  between 1999 and 2003, or during that period.   Where was

25  your primary location for that period of time, if there

13

1    was one?

2         A    Well, I was at Exxon/Mobil.

3         Q    Where's that located?

4         A    In Torrance.

5         Q    That was your primary location; is that right?

6         A    Uh-huh.   Yes.

7         Q    And then during that period your primary location

8    was Exxon/Mobil, but you'd get sent out to other jobs to

9    other places sometimes?

10        A    Yes.

11        Q    Is that being -- is that called being called out

12   or --

13        A    No.   Exxon/Mobil, I did on one year on one

14   project, and then it got slow, and maybe about two months

15   later I was sent back for another year.

16        Q    To Exxon/Mobil again?

17        A    Uh-huh.   Yes.

18        Q    See, it's harder than you thought.

19             MR. TINDALL:   You're doing fine.

20   BY MR. TORRANO:

21        Q    So when you started as an NDE assistant way back

22   when, in 1991, you were at the UltraMar facility, which is

23   now known as Valero?

24        A    Yes.

25        Q    Then you got additional certifications and got

14

1    some promotions and continued on in terms of the kinds of

2    duties you were doing, in 1996 CONAM purchased MMP, at

3    that stage, as I understand it, you were still primarily

4    at the Valero location, in 1997 you got a 2-year position,

5    essentially, at BP Carson; is that right?

6        A    Yes.

7        Q    Okay.  After that 2 years was up, between 1999

8    and 2003 you were primarily stationed at Exxon/Mobil in

9    Torrance, but, again, periodically you'd get sent to other

10   facilities depending on need; is that right?

11       A    Need and -- yeah, basically need.

12       Q    Okay.  To the extent they needed you somewhere

13   else, they'd call you up to do something else; is that

14   right?

15       A    Yes.

16       Q    Then in 2003 you got the capital project

17   inspector position at BP Carson?

18       A    Yes.

19       Q    And you were -- well, strike that.

20            What happened after that?  Did you stay at

21   BP Carson until you left the company?

22       A    Yes.

23       Q    In the same position?

24       A    Yes.

25       Q    All right.  So just to give the end, the recap,

1  you took the capital project inspector job in 2003, which

2  was at BP Carson, and you kept that until you went to BP

3  as an employee in 2007?

4      A   Yes.

5      Q   All right.  Does that summarize your work

6  trajectory as basically as we can at this point?

7      A   Yes.

8      Q   Other than the locations you've told me about,

9  can you think of other locations at MMP or CONAM at which

10 you worked during the time you were employed there?

11     A   For -- I mean, I did day jobs.  I can't -- I

12 can't remember where I went.

13     Q   Okay.  So you did day jobs, you went on other

14 projects.  Have you told me the locations where you

15 primarily worked, that is, the primary locations where you

16 worked?

17     A   Right.

18     Q   Is that right?

19     A   Yes.

20     Q   Okay.

21         I'd like to mark, as Exhibit 1 -- off the record

22 for a second.

23         (Discussion off the record.)

24         MR. TORRANO:  Let's mark, as Exhibit 4, a

25 document entitled "Acknowledgement" Bates-stamped

1      Q    Yeah.  Do you know what the schedules were for

2   CONAM locations outside Southern California while you

3   worked at CONAM?

4      A    No.

5      Q    Did you ever work at CONAM facilities -- strike

6   that.

7           Did you ever work for CONAM at refinery

8   facilities or other facilities outside Southern

9   California?

10     A    Yes.

11     Q    When was that?

12     A    That was in between '99 and 2001.

13     Q    What did you do?

14     A    I was called out to do some heater tube work at

15   Pittsburgh, at a boiler plant in Pittsburgh, California.

16     Q    Do you remember the name of the plant?

17     A    I can't remember.  I was only there for about two

18   weeks.

19     Q    All right.  So sometime in the time frame 1999 to

20   2001 you were called out up to Pittsburgh for about two

21   weeks to work on a boiler plant; is that right?

22     A    Yes.

23     Q    Is that the only time you worked outside the

24   Southern California area on behalf of CONAM?

25     A    Yes.

```
 1        Q    Do you know from firsthand knowledge whether

 2   others who worked for CONAM took a second meal break to

 3   the extent they were working between 12 -- strike that, 10

 4   and 12 hours?

 5        A    No.

 6             MR. TINDALL:  I'm sorry, no, you don't know or

 7   no, they didn't take it?

 8             THE WITNESS:  No, I didn't know.

 9   BY MR. TORRANO:

10        Q    Okay.  When you were working -- strike that.

11             Do you have any knowledge of how many employees

12   CONAM employed at the Shell facility in Benecia at any

13   point?

14        A    No, I don't know how many.

15        Q    Do you know anything about the pay practices of

16   CONAM -- strike that.

17             During the time that you worked for CONAM did you

18   have any knowledge of the pay practices of CONAM with

19   regard to its employees that worked at the Shell facility

20   in Benecia?

21        A    No.

22        Q    Have you ever reviewed payroll records for any of

23   CONAM's employees?

24        A    No.

25        Q    Have you ever reviewed your own payroll records?
```

1          I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11         Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [  ] was [  ] was not requested.

15         I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19   subscribed my name.

20

21   Dated:  _____ JUL 0 1 2008 _____

22

23         _____ Cheryl R. Kamalski _____

24         CHERYL R. KAMALSKI
           CSR No. 7113

25

# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GERALD LEE and STEVE TAYLOR,
individually and on behalf of
all others similarly situated,

      Plaintiffs,

    vs.                              No. 3:07-CV-044956-SI

CONAM INSPECTION AND
ENGINEERING SERVICES, INC.,

     Defendant.

CERTIFIED
COPY

---

DEPOSITION OF STEVE E. TAYLOR

Los Angeles, California

Thursday, June 12, 2008

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 89462A

1    worked at the BP Carson refinery, another BP facility in

2    Paramount, a pipeline project in Manhattan Beach, perhaps

3    a Chevron project, and at an AES power plant in

4    Long Beach.    Is that accurate?

5        A    That's accurate.

6        Q    All right.    Can you give me the time frames, as

7    best you can recall, that you worked at each one of these

8    facilities for CONAM.    Let's start with BP Carson?

9        A    Repeat the question, please.

10       Q    Let me try to go through it piece by piece.

11            When you were hired by CONAM did you begin your

12   work at the BP Carson facility?

13       A    Yes.

14       Q    How long did you work at that facility?

15       A    Probably about six.

16       Q    Six months?

17       A    Six, seven months.

18       Q    And remind me what your duties were there?

19       A    Assistant, helping the technician.

20       Q    All right.    After the BP Carson facility, that

21   is, after six months, what facility did you next go to to

22   work for CONAM?

23       A    Periodically other jobsites.

24       Q    I see.    Were you primarily employed at the

25   BP Carson facility, then periodically you would move out

40

1    to other sites if necessary?

2         A    Correct.

3         Q    All right.  So BP Carson was the primary facility

4    at which you worked.  Then when you talk about the BP

5    facility in Paramount, the pipeline in Manhattan Beach and

6    the AES power plant in Long Beach are those locations that

7    you would just be periodically sent out to work at for a

8    shorter period of time?

9         A    Yeah, maybe a week or two on assignments.

10        Q    Did you also work as a tech in those instances?

11        A    Right.

12        Q    Can you recall, as you sit here, the timing of

13   your work at the other locations besides the BP Carson

14   location?

15        A    Each shift was 10-hour days.

16        Q    I wasn't very clear.

17             Can you recall, as you sit here, when it was in

18   time that you were sent out for 1- or 2-week periods to

19   work at these other locations?

20             MR. TINDALL:  I'm sorry, you're asking what

21   dates?

22   BY MR. TORRANO:

23        Q    Correct.

24        A    Okay.  Thank you.  I can't recall the exact

25   dates.

STEVE E. TAYLOR                                    06/12/08

1          Q    Do you have any recollection, even if it's a

2     ballpark or an estimate?  Let me try it this way.

3               You went to work at BP Carson?

4          A    Right.

5          Q    Do you remember the first time that you were sent

6     out to work at some other location?

7          A    Not really.

8          Q    Okay.  Was there ever a time where your primary

9     place of employment for CONAM was a location other than

10    BP Carson?

11         A    No.

12         Q    During the time that you worked for CONAM was

13    your rate of pay ever changed?

14         A    Yes.

15         Q    What was it that you started at and when was it

16    changed to and to what?

17              MR. TINDALL:  Objection; compound.

18              You can answer.

19              THE WITNESS:  My starting wage was $10, and when

20    I received an increase, it went from 10 to 12.

21    BY MR. TORRANO:

22         Q    Do you remember when that happened?

23         A    I could say maybe in the month of October.

24         Q    Were you considered, to the best of your

25    knowledge, a permanent employee at CONAM or were you an

42

1      A    Yes.

2      Q    If they did not tell you, how did you know what

3  the schedule would be?

4      A    It would sometimes come through the technician,

5  he would get the word from the office personnel being able

6  to communicate with me that I would be working with that

7  individual.

8      Q    I see.  Do you know whether or not Conam's pay

9  practices, when I say "pay practices" I mean practices

10  with regard to paying overtime, do you know whether or not

11  Conam's pay practices varied from work site to work site?

12      A    No.

13      Q    Do you know whether or not Conam's -- strike

14  that.

15          Do you know whether or not individual CONAM

16  employees taking second meal breaks varied from CONAM work

17  site to work site?

18      A    No.

19      Q    Do you know how many CONAM employees were

20  employed in Northern California during the time that you

21  worked for CONAM down here?

22      A    No.

23      Q    Did you know any of those fellows up there?

24      A    No.

25      Q    Since you filed this lawsuit have you talked to

69

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were duly sworn; that a record of the

7     proceedings was made by me using machine shorthand

8     which was thereafter transcribed under my direction;

9     that the foregoing transcript is a true record of the

10    testimony given.

11         Further, that if the foregoing pertains to

12    the original transcript of a deposition in a Federal

13    Case, before completion of the proceedings, review of

14    the transcript [   ] was [   ] was not requested.

15         I further certify I am neither financially

16    interested in the action nor a relative or employee

17    of any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date

19    subscribed my name.

20              JUL 0 1 2008

21    Dated: _____

22

23              _____
                *Cheryl R. Kamalski*
24              CHERYL R. KAMALSKI
                CSR No. 7113

25